**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JAMES CONNOLLY, DAVID MANGANELLA, DUSTIN BAUER, KIYA BAUER, SOPHIA BAUER, CHRISTOPHER LANDRY, SHAWN DONNERY, JARROD LAGRONE, CHRISTOPHER HALSKI, NICHOLAS ANNA, TIMOTHY DUVALL JR., EMILY STEVENSON, THOMAS HENSHALL JR., MARK WHETZEL, JENNIFER WHETZEL, DIANNA WHETZEL, BRIAN FIFER, KELLI FIFER, ROBERT MASON, ROCHELLE LANG, EMANUEL ALVAREZ, MICHAEL OWEN, RILEY OWEN, LAURIE MILLER, SEAN WILLIAMS, MARY TOLLEFSON, JAMIE TOLLEFSON, JEFFREY TOLLEFSON, DAVID TANNER, GRAHAM LINDSEY, LORAMAY DIAMOND individually, and as representative for the ESTATE OF SEAN D. DIAMOND, ATHENA DIAMOND, MADISON DIAMOND, SEAN DIAMOND, TAYLOR DIAMOND, JASON DIAMOND individually, and as representative for the ESTATE OF SALLY WILEY, and the ESTATE OF JAMES WILEY, SHAWN DURNEN, RICHARD HEDGECOCK II, KARA CONNELLY, JEAN DAMMANN, KEVIN CONNELLY, MARK DAMMANN, MIGUEL GONZALEZ, MARK FLETCHER, TRISTA MOFFETT individually, and as representative for the ESTATE OF MICHAEL ANAYA, and the ESTATE OF CHERYL ANAYA, CARMELO ANAYA JR., PRISCILA MONCADA, OBDULIA MONCADA, ALEXANDRA AGUILAR, MIRIAM LOPEZ, DANIELA MONCADA, MATTHEW MONCADA, JOSEPH SANTOLLA, JEANNETTA SANTOLLA, SARAH SANTOLLA, KAREN JAMES, CHERYL LARSON, BRANDY LOSS, WANONIA POLK, MARY POLK, WALTER POLK, ALVIN JONES III, DEANDRA JONES, XAVIER JONES, RANDALL KLINGENSMITH, STEPHEN EVANS, ATYINIA WILLIAMS, C.W. by and through his next friend Atyinia Williams, JEFFREY EVANS, ROBIN HONEYCUTT, JEFFERY BURTON, JANE BURTON, CHARLES BURTON, PATRICK BURTON, JEREMY CASHWELL, KYLE LLOYD, JOSHUA CRAVEN, HOLLY CRAVEN, THORNELL RHETT, JASON RHETT, MATTHEW WHITESIDE, KANDI | 1:26-cv-3074<br><br>JURY TRIAL DEMANDED |

WHITESIDE, M.W. by and through her next friend MATTHEW WHITESIDE, SHARON WHITESIDE, MARK WHITESIDE, CHRISTOPHER WHITESIDE, JACKSON WHITESIDE, OLNEY JOHNSON, SHARON STALLWORTH, WALTER THOMAS, SAM KALLABAT, FADIA KALLABAT, KEVIN KALLABAT, NICHOLAS KALLABAT, URSULA KALLABAT, DARRYL DOTSON JR., ANGELA GARCIA, individually and as representative for the ESTATE OF CHRISTIAN GARCIA, K.G. by and through his next friend ANGELA GARCIA, KLARYSSA GARCIA, CHRISTOPHER SATTERFIELD, JOEL HERNANDEZ, VICTORIA HERNANDEZ, MICHAEL PASCO, MARIA VAZQUEZ individually, and as representative for the ESTATE OF OMAR VAZQUEZ, MARISEL VAZQUEZ, JARED BURGESS, THOMAS GREGORY III, TYMON COLEMAN, ASTRA COLEMAN, T.C. by and through his next friend Astra Coleman, TONI ATTANASIO individually, and as representative for the ESTATE OF CHRISTOPHER FISHBECK, GARY FISHBECK, RENE GUTEL, RANDI MARTZ, ANA GOMEZ, LINDA HARTWICK individually, and as representative for the ESTATE OF ROBERT HARTWICK, ROBERT A. HARTWICK, HANNAH HARTWICK, HALEY PRESTON, CHRISTIAN RODRIGUEZ, C.R. by and through his next friend CHRISTIAN RODRIGUEZ, JARRAD DAVENPORT, LATOYA DAVENPORT, DARRIUS DAVENPORT, JARRAD E. DAVENPORT, X.D. by and through his next friend Jarrad Davenport, STEPHANIE ZOBAY individually, and as representative for the ESTATE OF STEPHEN EVERHART, HANNAH EVERHART, HAYDEN EVERHART, LINDSAY EVERHART, ABDUL MUGHAL, SITORAI KHASANZOD, ANGELA MUGHAL, HAMID MUGHAL, KHALID MUGHAL, M.M. by and through his next friend Abdul Mughal, NABILA MUGHAL, Paula Talbert as representative for the ESTATE OF JOSEPH TALBERT, JASON RZEPA, CASSANDRA RZEPA, C.R. by and through his next friend Cassandra Rzepa, KOHL RZEPA, TYLER OGDEN, SHERYL CHEN, JERRIN OGDEN, WILLIAM CHINN, SEAN NIQUETTE, LAUREN NIQUETTE, MARY NIQUETTE, THOMAS NIQUETTE, BRIAN ALLDRIDGE, DIANNA ALLDRIDGE, RONALD

ALLDRIDGE, TODD ALLDRIDGE, ANDREW MAJOR, and MARCUS SULLEN,

Plaintiffs,

v.

UNICREDIT BANK GMBH (d/b/a HypoVereinsbank), UNICREDIT BANK AUSTRIA AG, and UNICREDIT S.P.A,

Defendants.

# COMPLAINT FOR VIOLATIONS OF THE ANTI-TERRORISM ACT

# TABLE OF CONTENTS


INTRODUCTION ..... 3

THE PARTIES ..... 8

A. Plaintiffs ..... 8

B. Defendants ..... 8

JURISDICTION AND VENUE ..... 9

SOURCING ..... 11

FACTUAL ALLEGATIONS ..... 12

I. As Iran Became the World's Leading Sponsor of Terrorism and Other Banks Exited Iran, HypoVereinsbank Cultivated Clients Associated with Iranian Terrorism by Scheming to Disguise their Transactions. ..... 12

A. Iran's Axis of Resistance ..... 13

B. Warnings and Counterterrorism Controls ..... 22

C. HypoVereinsbank's Special Money Laundering Services for Iran Clients ..... 27

II. HypoVereinsbank's Money Laundering for IRISL Enabled the Supply of Weapons to Terrorists in Iraq. ..... 32

A. IRISL's Worldwide Shipping Network Supplied Weapons to Terrorists. ..... 33

B. The International Community Issued Numerous Warnings and Imposed Sanctions and Counterterrorism Controls to Stop IRISL from Supplying Weapons to Terrorists. ..... 39

C. HypoVereinsbank Laundered IRISL's Payments in Defiance of Sanctions and Counterterrorism Controls. ..... 52

D. HypoVereinsbank Sustained IRISL's Operations Through 2011, Enabling it to Keep Supplying Weapons to Terrorists. ..... 63

E. IRISL's Continued Operations Were Vital to the Supply of Weapons to Terrorists in Iraq. ..... 72

III. With Weapons from IRISL, Hizballah Planned, Authorized, and/or Committed the Terrorist Attacks in Iraq that Injured Plaintiffs. ..... 89

A. Hizballah Planned, Authorized, and/or Committed the Attacks with JAM. ..... 89

B. Plaintiffs Were Injured in the Attacks. ..... 94

CLAIM FOR RELIEF ..... 110

JURY DEMAND ........................................................................................................ 113
PRAYER FOR RELIEF ............................................................................................ 114

## INTRODUCTION

1. This lawsuit seeks civil damages under the Antiterrorism Act ("ATA"), as amended by the Justice Against Sponsors of Terrorism Act ("JASTA"),[1] which entitles any U.S. national injured by reason of an act of international terrorism committed, planned, or authorized by a designated Foreign Terrorist Organization ("FTO") to recover against any person "who aids and abets, by knowingly providing substantial assistance."[2] For many years through at least 2011, Defendant Unicredit Bank GmBH, doing business as HypoVereinsbank, (hereinafter, "HypoVereinsbank" or "HVB") kept the chief supplier of weapons to Hizballah terrorists operating when the rest of the world was trying to stop it. This lawsuit seeks compensation for the American victims who suffered when the weapons supplied with HypoVereinsbank's assistance reached the terrorists.

2. HypoVereinsbank's major client, the Islamic Republic of Iran Shipping Lines ("IRISL"), was no ordinary company. It was the primary maritime cargo carrier for the world's leading State Sponsor of Terrorism, and it functioned as the logistical backbone of a campaign by Iran's Islamic Revolutionary Guard Corps ("IRGC") and Hizballah to target Americans by supplying terrorists with large quantities of weapons. These weapons and their components—including the rockets, mortars, explosives, and armor-piercing ammunition that those terrorists used to take countless American lives in Iraq—were frequently sourced in bulk from Asia and supplied in bulk to Iran's proxies in the Middle East. IRISL was indispensable at both ends of this pipeline, carrying hundreds of tons of precursor chemicals for rocket engines and explosives, containers packed with armor-piercing ammunition, crates upon crates of rockets and mortars,

---

[1] 18 U.S.C. § 2333, amended by Pub. L. No. 114-222, 130 Stat. 852 (2016) ("JASTA").

[2] 18 U.S.C. § 2333(a), (d)(2).

and more—all camouflaged by IRISL's regular shipment of ordinary goods on common shipping routes between Asia, the Middle East, and Europe.

3. None of this was a secret. Iran's use of maritime shipping to arm its terrorist proxies was made clear when ships were seized and the international media publicized their illicit cargo. The international community and the U.S. government publicly identified IRISL as Iran's maritime weapons supplier, and they issued numerous warnings—even delivered in person to European banks—that doing business with companies like IRISL would enable terrorist attacks on Americans by Iran's proxies in Iraq. These warnings culminated in sanctions the U.S. government imposed on IRISL, intended to stop IRISL's operations by cutting IRISL off from the international financial system upon which it depended. To the international community, IRISL was a pariah.

4. But not to HypoVereinsbank. As nearly every other Western bank heeded the warnings and abandoned Iran, HypoVereinsbank saw opportunity. Through its offices in Hamburg and Tehran, HypoVereinsbank developed a close and unusual relationship with IRISL. Iran's maritime weapons supplier became a lucrative HVB client, and HypoVereinsbank maintained its relationship with IRISL by giving it the most illicit service a bank can offer: secrecy. Contrary to its legal obligations to report suspicious transactions to government authorities, HypoVereinsbank instructed its staff to hide or omit transaction information to "ensure" that information about IRISL transactions was "not transmitted to" the U.S., and HVB established a "Safe Accounts" policy that entailed setting up accounts in the names of shell corporations to enable IRISL to send payments in U.S. dollars (USD) through the international financial system and transact with counterparties without identifying that IRISL was behind the

payments.[3] Between 2006 and 2011, HypoVereinsbank processed USD payments totaling approximately $320 million for IRISL through financial institutions located in the United States—thereby keeping IRISL operating while violating the sanctions designed to stop it.

5. HypoVereinsbank knew its conduct was unusual and wrong. Indeed, one bank employee acknowledged in an internal email that "[o]ther German banks" were "much stricter than we are" with IRISL.[4] HypoVereinsbank also knew that shielding Iran's maritime weapons supplier behind a veil of shell companies would keep the weapons flowing. A HypoVereinsbank official even circulated a news article about IRISL within the bank about IRISL's transportation of weapons materials, expressing concern about the bank's relationship with IRISL "from a reputational point of view."[5] But none of this deterred HypoVereinsbank. The bank continued to help IRISL hide behind shell companies and evade U.S. counterterrorism controls for years, moving $275.5 million for IRISL through the U.S. financial system after it was sanctioned in September 2008, thereby enabling IRISL to continue supplying weapons to terrorists in Iraq as the terrorists accelerated their deadly campaign against Americans.

6. Importantly, HypoVereinsbank's assistance to IRISL and the terrorists it armed went far beyond providing IRISL with the ability to access money. Rather, HypoVereinsbank enabled two functions critical to the terrorists' operations: logistics and obstruction. By facilitating IRISL's shipping network, HypoVereinsbank enabled a critical logistics function, maintaining the essential supply lines that allowed weapons and their components to move undetected to the places where they were needed for terrorist attacks. And by concealing IRISL

[3] Statement of Offense ¶¶ 41-42.

[4] Statement of Offense ¶ 49.

[5] Statement of Offense ¶ 55.

behind a web of shell companies and obscuring its identifying information, HypoVereinsbank enabled a critical obstruction function, thwarting counterterrorism authorities, including financial regulators and intelligence agencies, who relied on reporting from banks to interdict and stop these shipments and the inevitable ensuing attacks.

7. U.S. authorities eventually discovered HypoVereinsbank's misconduct. In 2019, HypoVereinsbank entered into a plea agreement with the U.S. Department of Justice ("DOJ") and the New York County District Attorney's Office ("DANY"), under which it pleaded guilty to conspiring to defraud the United States and to violate its sanctions laws, and to violating financial laws of the State of New York; a settlement agreement with the U.S. Department of the Treasury's ("Treasury") Office of Foreign Assets Control ("OFAC"); a consent order with the New York Department of Financial Services ("NYDFS"); and orders with the Board of Governors of the Federal Reserve ("FRB"). These resolutions in which HypoVereinsbank admitted much of its illegal conduct confirm just how conscious and culpable its actions were. As the U.S. Attorney for the District of Columbia summarized, HypoVereinsbank's actions in deliberately providing IRISL with access to the U.S. financial system for almost two years after it was sanctioned were "particularly egregious" and merited "severe consequences." Such actions, the Assistant Director in Charge of the Federal Bureau of Investigation (FBI) added, are "a prime example of how some institutions erroneously believe they can game the U.S. financial system and conceal their nefarious activity." HypoVereinsbank agreed to pay over $1.3 billion of penalties to resolve these enforcement actions, in recognition of its immense culpability.

8. But HypoVereinsbank has not yet paid its debt to the victims who suffered from its misconduct. The weapons that HypoVereinsbank enabled IRISL to supply fueled the terrorist attacks in Iraq that injured Plaintiffs. These Plaintiffs are the victims of numerous terrorist

attacks committed in Iraq from 2008 to 2011 with the types of weapons that IRISL supplied to the terrorists who used them against Americans.

9. In enacting JASTA, Congress sought "to provide civil litigants with the broadest possible basis … to seek relief against" anybody that has "provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States."[6] This includes those who act "knowingly or recklessly," and support terrorism "directly or indirectly."[7] Congress later reaffirmed the "long-standing policy of the United States that civil lawsuits against those who support, aid and abet, and provide material support for international terrorism serve the national security interests of the United States by deterring the sponsorship of terrorism and by advancing interests of justice, transparency, and accountability."[8] Plaintiffs' claims advance these vital national interests.

---

[6] JASTA § 2(b).

[7] JASTA § 2(a)(6).

[8] Sudan Claims Resolution Act, Pub. L. No. 116-260, div. FF, tit. XVII, § 1706(a)(1), 134 Stat. 1182, 3294 (2020).

## THE PARTIES

**A. Plaintiffs**

10. Plaintiffs are 166 direct and indirect victims of numerous terrorist attacks committed in Iraq from 2008 through 2011. Direct victims were physically injured or killed in the attack. Indirect victims are the direct victims' close family members who suffered financially and emotionally as a result of the attacks. They include spouses, children, parents, siblings, and other close relations of the direct victims. Each Plaintiff is either a U.S. national or the estate, survivor, or heir of a U.S. national.[9]

**B. Defendants**

11. Defendant UniCredit Bank GmBH, doing business as "HypoVereinsbank" or "HVB" is one of the largest banks in Germany. Headquartered in Munich, Germany, UniCredit Bank GmBH operates globally through a number of subsidiaries, branches, and offices, including a U.S. branch located in New York, New York, a branch located in Hamburg, Germany, and during the relevant period, a representative office located in Tehran, Iran.[10]

12. UniCredit Bank GmBH is part of the UniCredit Group, which includes several affiliated banks throughout Europe. Defendant UniCredit S.p.A., an Italian bank headquartered in Milan, is the parent company of the UniCredit Group and wholly owns and controls UniCredit

---

[9] "Estate" as used herein encompasses established estates, anticipated estates, as well as certain estate-like constructs available under the laws of certain States (such as "heirships"). The process of establishing certain estates is ongoing, and the identified family members or other individuals, as the anticipated personal representatives, bring these claims on behalf of the anticipated estates of such decedents and all heirs thereof. Each person so identified reserves all rights, including the right pursuant to Fed. R. Civ. P. 25, to seek to substitute for itself the decedent's estate, any successor thereto, or any subsequently named and/or designated estate representative.

[10] Statement of Offense ¶ 19.

Bank GmBH. UniCredit S.p.A. also wholly owns and controls Defendant UniCredit Bank Austria AG ("Bank Austria").

13. HypoVereinsbank was formed by the merger of two German banks in 1998 into a single entity, Bayerische Hypo-und Vereinsbank AG ("HypoVereinsbank"), which then acquired Bank Austria in 2000. Between 2005 and 2008, UniCredit S.p.A., acquired both HypoVereinsbank and Bank Austria. HypoVereinsbank was renamed "UniCredit Bank AG," and Bank Austria was renamed "UniCredit Bank Austria AG." UniCredit Bank AG subsequently changed its legal form from a public limited company (AG) to a limited liability company (GmbH) and became UniCredit Bank GmBH. However, the bank did business under the "HypoVereinsbank" brand name throughout the relevant period and continues to do so today.

14. All references in this Complaint to "HypoVereinsbank" and "HVB" refer to UniCredit Bank GmBH and its predecessor companies, including but not limited to UniCredit Bank AG and Bayerische Hypo-und Vereinsbank AG.

15. All references in this Complaint to "HypoVereinsbank" and "HVB" also refer to Defendants UniCredit S.p.A. and UniCredit Bank Austria AG to the extent that those affiliated entities are liable for the conduct of the German bank doing business as HypoVereinsbank during the relevant period.

## JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. §§ 2333(a) and (d), and 18 U.S.C. § 2338.

17. HypoVereinsbank is subject to personal jurisdiction pursuant to 18 U.S.C. § 2334(a) and Fed. R. Civ. P. 4(k). As detailed below, HypoVereinsbank's tortious acts were facilitated by its U.S. personnel and its correspondent banks in the United States that played a

central role in providing U.S. dollar clearing and in misleading U.S. authorities, including OFAC in Washington, D.C., about HVB's transactions on behalf of IRISL. HypoVereinsbank purposefully availed itself of U.S. jurisdiction to commit the tortious acts described in this Complaint, including by processing financial transactions through its U.S. branch and its U.S. correspondent banks for the benefit of IRISL, knowing these transactions were enabling IRISL to maintain its weapons smuggling operation as detailed herein. Moreover, HypoVereinsbank made numerous misrepresentations in the U.S. to compliance staff, correspondent banks, and government authorities in Washington, D.C. regarding its transactions for IRISL, including falsifying business records relied upon by OFAC and counterterrorism authorities. HypoVereinsbank's conduct also aided and abetted terrorists who were at all times actively targeting Americans and committing terrorist attacks that killed or injured Americans, including the Plaintiffs.

18. HypoVereinsbank entered the United States voluntarily and has maintained a branch in New York since 1971.

19. Venue in this District is proper pursuant to 18 U.S.C. § 2334(a), because Plaintiffs James Connolly, Hayden Everhart, Lindsay Everhart, the Estate of Stephen Everhart, and Stephanie Zobay reside in this District.

20. Venue in this District is also proper pursuant to 28 U.S.C. § 1391 because a material and substantial part of HypoVereinsbank's activity occurred within the District, including, one or more meetings between HVB and Treasury officials in the District regarding HVB's services for clients like IRISL.

## SOURCING

21. The allegations herein are based in part on the plea and settlement agreements that HypoVereinsbank entered into with law enforcement and regulatory authorities in April 2019, as discussed above. Those agreements include: the Plea Agreement by HypoVereinsbank with DOJ and DANY, which was supported by a Statement of Offense; and Settlement Agreements and Consent Orders entered into with OFAC, FRB, and NYDFS.[11] Each agreement document contains lengthy and detailed factual statements regarding HypoVereinsbank's conduct. HypoVereinsbank has stipulated to the truth of these factual statements and has agreed that it will not make "any public statement contradicting or excusing" them.[12]

22. To resolve those enforcement actions, HypoVereinsbank paid U.S. and New York law enforcement and regulatory authorities over $1.3 billion in penalties and forfeitures and was ordered to substantially overhaul its compliance.

23. HypoVereinsbank always actively monitored every official United States warning, sanctions designation, press release, report, advisory, public statement, and finding, including those relating to American sanctions and terrorist financing risks regarding Iran, Hizballah, and Jaysh al-Mahdi, including those published by Treasury (including OFAC and FinCEN), and the U.S. Department of State ("State"). HypoVereinsbank did so through, *inter*

[11] *U.S. v. UniCredit Bank AG*, No. 1:19-cr-128 (D.D.C.), ECF 6 ("Statement of Offense"); ECF 5 ("Plea Agreement"); OFAC Settlement Agreement, Apr. 15, 2019 ("OFAC Settlement Agreement"), *available at* https://ofac.treasury.gov/media/12311/download?inline; FRB Order to Cease and Desist and Order of Assessment of a Civil Money Penalty, Apr. 15, 2019, *available at* https://www.federalreserve.gov/newsevents/pressreleases/files/enf20190415a1.pdf ("FRB Order"); NYDFS Consent Order under New York Banking Law Sections 39 and 44, Apr. 15, 2019, *available at* https://www.dfs.ny.gov/system/files/documents/2021/02/ea20190415_unicredit.pdf ("NYDFS Consent Order").

[12] Plea Agreement § 16.

*alia*, automated diligence databases, in-house compliance and intelligence personnel, and HVB's thousands of employees and agents across the globe, including in the United States, Germany, and Iran, each of whose knowledge is imputed to the bank. Accordingly, HypoVereinsbank had actual knowledge, in real-time, of each United States warning, sanctions designation, press release, report, advisory, public statement, and finding that any component of the U.S. government published when HypoVereinsbank engaged in the conduct alleged herein.

## FACTUAL ALLEGATIONS

### I. As Iran Became the World's Leading Sponsor of Terrorism and Other Banks Exited Iran, HypoVereinsbank Cultivated Clients Associated with Iranian Terrorism by Scheming to Disguise their Transactions.

24. For decades, elements of the Iranian regime have led an alliance—the self-styled "Axis of Resistance"—that has used terrorism to undermine American foreign policy and kill Americans across the Middle East. Their shared objective since the Islamic Revolution of 1979 was to force the United States (the "Great Satan") to exit the Middle East and abandon its allies there, including Israel (the "Little Satan").

25. Iran's Axis of Resistance pursued this objective through a coordinated campaign of terrorist attacks against Americans that has earned Iran a longstanding reputation as the world's leading state sponsor of terrorism.

26. Beginning in 1995 and accelerating through the 2000s, the U.S. imposed increasingly strict counterterrorism controls on the actors within the Iranian regime devoted to terrorism. Those controls prohibited certain transactions and subjected many others to surveillance and reporting. The U.S. government also initiated an intensive effort to warn European banks about the consequences of continuing to do business in Iran, as it was increasingly likely that such business would facilitate those actors' terrorism.

27. Most European banks heeded these warnings and determined that it was too risky to continue doing business in Iran. HypoVereinsbank did the opposite. It cultivated customers associated with Iran's terrorism and developed extraordinary mechanisms to launder their transactions through the international financial system to evade counterterrorism controls.

**A. Iran's Axis of Resistance**

28. Iran's Axis of Resistance consisted of elements within the Iranian regime dedicated to funding, supporting, and fueling terrorism, along with a collection of terrorist organizations that Iran supported and directed to carry out terrorist attacks targeting Americans throughout the Middle East.

29. **Islamic Revolutionary Guard Corps.** At the center of Iran's Axis of Resistance was the Islamic Revolutionary Guard Corps ("IRGC"), a parastatal terrorist organization not part of Iran's regular armed forces. The IRGC and its Qods Force ("IRGC-QF" or "Qods Force") led the Axis of Resistance by cultivating, training, and directing proxy terrorist organizations that carried out terrorist attacks targeting Americans outside Iran. These proxies were highly dependent on the IRGC for support, including for the money they needed to pay and incentivize their terrorists and the weapons they needed to commit their violent attacks.

30. In recognition of the IRGC's prolific terrorist activities, the U.S. designated its Qods Force a Specially Designated Global Terrorist ("SDGT") under Executive Order 13224 on October 25, 2007. The U.S. subsequently extended that designation to the entirety of the IRGC, and later designated it a Foreign Terrorist Organization ("FTO"). In an April 8, 2019, fact sheet, State summarized the IRGC's terrorist activity over the past several decades, explaining that "its support for terrorism is foundational and institutional." It "fund[ed]," "fuel[ed]," and

"equip[ped]" terrorists who "killed U.S. citizens." And in Iraq alone, it was "responsible for the deaths of at least 603 American service members . . . since 2003."

31. During the relevant period, the IRGC was led by Major General Mohammad Ali Jafari, who served as its Commander-in-Chief, and Major General Qasem Soleimani, who led its terrorist operations as Commander of the Qods Force. Jafari participated in the 1979 takeover of the U.S. Embassy during the Islamic revolution and then rose to become so hostile to the United States that he was known to give "new meaning to the term 'hardliner.'"[13] Jafari was sanctioned on September 29, 2010, pursuant to Executive Order 13553, for his role in serious human rights abuses. Days after he was appointed to lead the IRGC on September 1, 2007, Jafari promised to "expand" efforts against "the enemies of Iran and the revolution" by using "asymmetrical warfare capabilities, such as those used by Hezbollah," which "reflect the strengths and weaknesses of the U.S. forces in Afghanistan and Iraq"—*i.e.*, terrorism against Americans there.[14] Those efforts were directed by Soleimani, who was the principal architect of Iran's strategy to use terrorist proxies to attack Americans in Iraq and elsewhere. Soleimani was long regarded by the U.S. government as "the number-one terrorist anywhere in the world"[15] and "the point ma[]n directing the formulation and implementation of [Iran's] Iraq policy, with authority second only to Supreme Leader Khamenei."[16] After a brief lull in violence against Americans in

---

[13] Muhammad Sahimi, *A Hardliner's Hardliner: General Mohammad Ali Jafari*, PBS Frontline, Jan. 21, 2010.

[14] *Id.*; Vahid Sepehri, *Iran: New Commander Takes Over Revolutionary Guards*, Radio Free Europe, Sep. 4, 2007.

[15] President Donald J. Trump, Remarks by President Trump on the Killing of Qasem Soleimani (Jan. 3, 2020).

[16] U.S. Dep't of State, Cable, Iran's Efforts in Iraqi Electoral Politics (Nov. 13, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE101150_a.html

Iraq in 2006, Soleimani taunted U.S. commanders, "I hope you have been enjoying the peace and quiet in Baghdad. I've been busy in Beirut!"[17] Soleimani was sanctioned on October 25, 2007, pursuant to Executive Order 13382, based on his relationship to the IRGC; was sanctioned again on May 18, 2011, pursuant to Executive Order 13572 regarding human rights abuses; and was designated an SDGT on October 11, 2011, for plotting to assassinate the Saudi ambassador in the United States.

32. The IRGC procured, manufactured, and supplied weapons for its terrorist proxies through Iran's Ministry of Defense and Armed Forces Logistics ("MODAFL"), which the IRGC always controlled. During the relevant period, MODAFL was led by IRGC Brigadier General Mostafa Mohammad Najjar (2005-2009) and IRGC Qods Force General Ahmad Vahidi (2009-2013), who both ensured that MODAFL's shipping and procurement activity served the IRGC's terrorist aims. Before heading MODAFL, Najjar spent decades helping lead the IRGC, where he "played a key role in the formation of . . . Hezbollah" and was involved in the 1983 terrorist bombing of the U.S. Marine barracks in Beirut that killed hundreds of Americans.[18] Najjar publicly referred to the U.S. presence in the Middle East as a "satanic plot," hailed Hizballah as a "lesson in resistance," and vowed that "Islamic Iran . . . will give a powerful answer to enemies and oppressors."[19] Najjar was sanctioned on September 29, 2010, pursuant to Executive Order 13553, for his role in serious human rights abuses. Vahidi, who replaced Najjar as head of MODAFL in 2009, likewise spent decades orchestrating IRGC terrorism. He led the IRGC's

---

[17] Dexter Filkins, *The Shadow Commander*, The New Yorker, Sep. 23, 2013.

[18] Col. Timothy Geraghty (ret.), *Beirut Bombing at 30: 'We Came in Peace*,' USNI News, Oct. 23, 2013.

[19] *Hezbollah has taught nations a lesson in resistance: Najjar*, Mehr News Agency, Aug. 12, 2006; *Iran will resist 'any threat': defense minister*, Reuters, Aug. 9, 2007.

Qods Force for many years, during which he oversaw the 1994 terrorist bombing of a Jewish community center in Argentina that killed 85 people and wounded hundreds. Vahidi was sanctioned on June 16, 2010, pursuant to Executive Order 13382, for his involvement in proliferation activities, and again on October 6, 2022, pursuant to Executive Order 13553, for his involvement in serious human rights abuses.

33. MODAFL was the IRGC's clearinghouse for the procurement, manufacture, and distribution of weapons large and small, from bullets and small arms to ballistic missiles and WMDs. MODAFL procured weapons and their components from abroad, manufactured weapons in Iran, and supplied the weapons it procured and manufactured to the IRGC's proxy terrorists.

34. Since 1996, the United States has repeatedly sanctioned MODAFL for its proliferation activities. In an action "to counter Iran's bid for nuclear capabilities and support for terrorism," the United States designated MODAFL along with the IRGC on October 25, 2007, as "key Iranian entities of proliferation concern." A September 17, 2008, sanctions announcement, the U.S. warned that MODAFL "attempts to shield its procurement activities behind a maze of entities." The United States again designated MODAFL on March 26, 2019, highlighting its "logistic support to the IRGC-QF and its regional proxy groups."

35. Due to the determination of IRGC and Hizballah Supreme Commander Ayatollah Khamenei to prioritize exporting the revolution through terrorist attacks against the United States and its allies, the IRGC was also given extraordinary control over Iran's most important economic and social institutions. This included IRGC control over key sectors of the Iranian economy, such as banking and oil and gas, as well as key government institutions, such as those responsible for maritime shipping and weapons manufacturing. With the IRGC in control, the primary function of these businesses and institutions shifted to serve the IRGC's terrorist aims.

Their profits were redirected to fund IRGC terrorism, and their operations were transformed to support it. As U.S. Deputy Treasury Secretary Wally Adeyemo summed up in April 9, 2024, testimony to Congress, “what we’ve seen time and time [again] from the Iranian regime is [that] they fail to feed their people and they put the IRGC first. Any dollar they have will go towards their violent activity before they deal with the people.”

36. **Hizballah.** The IRGC’s most important terrorist partner in the Axis of Resistance was Lebanese Hizballah (“Hizballah”), which has been an FTO since 1997 and has long been dedicated to terrorism targeting Americans.

37. In 1982, the IRGC founded Hizballah in Lebanon, establishing the group as its most important terrorist partner and lead external attack arm. During the relevant period, every Hizballah operative swore a religious oath of loyalty to Ayatollah Khamenei.

38. In 2003, Hizballah Secretary-General Hassan Nasrallah proclaimed: “Let the entire world hear me. Our hostility to the Great Satan [America] is absolute . . . . Regardless of how the world has changed after 11 September, Death to America will remain our reverberating and powerful slogan: Death to America.”[20]

39. To advance those aims of the Axis of Resistance, Hizballah has coordinated terrorist attacks around the world primarily by acting through terrorist proxies. As Dr. Matthew Levitt has explained, “Hezbollah is extremely adept at recruiting members from local populations in areas where they have networks on the ground.”[21] Hizballah has trained and equipped these local terrorist proxies to carry out terrorist attacks on Hizballah’s behalf.

---

[20] Hizballah Manifesto, *reprinted in* Anti-American Terrorism and the Middle East: A Documentary Reader 50 (Barry Rubin & Judith Colp Rubin eds., Oxford Univ. Press 2002).

[21] Matthew Levitt, Hezbollah: A Case Study of Global Reach, Remarks to a Conference on “Post-Modern Terrorism: Trends, Scenarios, and Future Threats,” Sept. 8, 2003).

40. Hizballah was ubiquitous in Lebanon and Syria, but also maintained a significant presence in Iraq and the Palestinian Territories.

41. Hizballah was completely dependent on the IRGC and MODAFL for weapons. As its Secretary-General Hassan Nasrallah publicly admitted in June 24, 2016 speech, "everything [Hizballah] eats and drinks, its weapons and rockets, come from the Islamic Republic of Iran."

42. References in this Complaint to "Iran" or the "Iranian regime" in the context of funding, arming, or supporting terrorist attacks refer specifically to the IRGC and Hizballah, which were always Iran's primary institutions dedicated to supporting Iran's terrorist proxies and advancing their terrorist mission. Hizballah and the IRGC were so closely intertwined that Hizballah functioned as a core part of the IRGC itself, as well as the IRGC's primary agent for orchestrating Iran-backed proxy attacks by others, including Jaysh al-Mahdi. In recognition of the IRGC's "coordination of Hizballah attacks" and "deep involvement in directing Hizballah's political decision-making," the U.S. designated Hizballah on August 20, 2026, "for being owned, controlled, or directed by, or having acted or purported to act for or on behalf of, the IRGC-QF."

43. **JAM.** On March 19, 2003, the United States invaded Iraq, Saddam Hussein's government fell, and formal armed hostilities between the United States and the Iraqi government ended on May 1, 2003. After that date, American troops deployed to Iraq performed a peacekeeping and nation-building function, rather than a warfighting function. American troops' primary purpose was to create the political and security conditions conducive to Iraqi democracy. Americans in Iraq began overseeing the reconstruction of a democratic Iraqi government and formulating a plan to transfer sovereignty to the Iraqi people.

44. In April 2003, Hizballah dispatched to Iraq its chief terrorist mastermind, Imad Mugniyeh, to help Muqtada al-Sadr found a new terrorist organization, Jaysh al-Mahdi ("JAM"). Their shared goal, according to an October 2003 Israeli intelligence report, was to set up a terrorist network in Iraq to inflict "mass casualties" on the Americans working on the reconstruction.[22] A U.S. Special Operations task force report quoted by the *U.S. News & World Report* in 2004 explained that "the Lebanese Hizballah leadership believes that the struggle in Iraq is the new battleground in the fight against the U.S."[23] As one embedded war correspondent put it, JAM was created to be "the Iraqi branch of Hezbollah."[24]

45. JAM itself proclaimed its identification with Hizballah. As Muqtada al-Sadr put it, JAM would serve as Hizballah's "striking arm in Iraq."[25] During his Friday sermons on March 26, 2004—in which he praised the attacks of September 11th and called for violence against Americans in Iraq—Sadr swore fealty to Hizballah in Shi'a Islamic terms, pledging support to "our victorious party, Hezbollah." In April 2004, Sadr proclaimed, "I will support the real Islamic unity that has been created by Hassan Nasrallah, the secretary-general of the victorious Hezbollah."[26] In an August 2007 interview, Sadr again reportedly acknowledged that JAM "ha[s] formal links with Hizbollah" and "cop[ies] Hizbollah in the way they fight and their tactics."[27]

---

[22] Edward T. Pound, *Special Report: The Iran Connection,* U.S. News & World Report, Nov. 22, 2004.

[23] *Id.*

[24] Michael J. Totten, *Balance of Terror*, Michael J. Totten's Middle East J., Aug. 14, 2007.

[25] Jon Lee Anderson, *The Uprising: Shia and Sunnis put aside their differences,* The New Yorker, Apr. 26, 2004.

[26] *Gunmen kill 4 people in attacks on Iraqi police*, China Daily, Apr. 4, 2004.

[27] Anthony H. Cordesman & Jose Ramos, *Sadr and the Mahdi Army: Evolution, Capabilities, and a New Direction*, Center for Strategic & International Studies, Aug. 4, 2008.

46. JAM fighters also swore fealty to Hizballah. They regularly participated in anti-American marches in which they marched under Hizballah flags, waved Hizballah banners at demonstrations, and shouted chants identifying themselves with Hizballah. Tens of thousands of members of JAM publicly swore fealty to Hizballah in various marches in Sadr City in 2006 alone. On August 4, 2006, for example, more than 10,000 members of JAM attended a joint JAM/Hizballah march in Sadr City. As recounted in a field report in *Al-Jazeera*, demonstrators wore "white shrouds symboli[z]ing [their] willingness to die for Hezbollah, waved the Lebanese guerrillas' yellow banner and chanted slogans in support of their leader, Sheik Hassan Nasrallah."[28] The crowd of JAM fighters further declared "Mahdi Army and Hezbollah are one," and chanted "Allah, Allah, give victory to Hassan Nasrallah."[29] The close, symbiotic connection between Jaysh al-Mahdi and Hizballah was summed up by JAM members' repeated declaration at the rally: "we are Hezbollah."[30]

47. Treasury formally recognized the links between Hizballah and JAM when it designated JAM commander Abu Mahdi al-Muhandis as a SDGT in 2009, noting that Hizballah "prepare[d]" JAM "for attacks against Coalition Forces" through "training in guerilla warfare, handling bombs and explosives, and employing weapons [such as] missiles, mortars, and sniper rifles."[31] Treasury did so again in 2012 when it found that "Hizballah, along with its Iranian allies, trained and advised Iraqi militants to carry out numerous terrorist attacks."[32]

---

[28] *Iraq's Shia March for Hezbollah*, Al-Jazeera, Aug. 4, 2006.

[29] *Id*.

[30] Andy Mosher, *In Baghdad, Shiites Rally for Hezbollah*, The Washington Post, Aug. 5, 2006.

[31] U.S. Dep't of Treasury, Treasury Designates Individual, Entity Posing Threat to Stability in Iraq (July 2, 2009).

[32] U.S. Dep't of Treasury, Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq (Nov. 19, 2012).

48. Hizballah supervised JAM's terrorist operations by recruiting, training, arming, and directing JAM terrorists who carried out terrorist attacks against Americans on Hizballah's behalf. Immediately after JAM's founding in April 2003, Mugniyeh recruited 300 terrorists for JAM from Shi'a communities in Kuwait and Saudi Arabia, then sent those terrorists to Lebanon for weapons training. These 300 fighters were some of JAM's first members. That same month, according to the *Asia Times*, Hizballah "opened two offices in the Iraqi cities of Basra and Safwan" to "build[] up [its] organizational and military apparatuses in Iraq."[33] By August 2003, Hizballah had established permanent teams of 30 to 40 operatives in Najaf to recruit and train JAM terrorists. At the same time, these Hizballah operatives were acquiring weapons from the IRGC for JAM's use in terrorist attacks.

49. During the subsequent months and years, as explained *infra* at 89-94, Hizballah expanded its presence on the ground in Iraq and armed JAM with many more weapons from the IRGC. And Hizballah leveraged JAM to accelerate the campaign of terrorist attacks on Americans in Iraq—forming joint cells of Hizballah and JAM terrorists in Baghdad and Basra, among other locations, who committed terrorist attacks together, and planning and authorizing even more terrorist attacks committed by JAM.

50. Like many terrorist organizations, JAM was structured as an integrated network of cells, militias, and "Special Groups," each of which served the mission of the broader organization. JAM's "Special Groups" included Asa'ib Ahl al-Haq (AAH) and Kataib Hizballah (KH). Despite its cellular structure, JAM's cells maintained a basic hierarchical command structure; shared membership and leadership; relied on common sources of financing and institutional support from the broader JAM organization; frequently operated together in

[33] Olivier Guitta, *Nasrallah's Other Fight*, Asia Times, July 29, 2006.

coordinated attacks; and were unified ideologically by radical Shi'a ideology, devotion to Sadr, and violent opposition to the American presence in Iraq. All references in this Complaint to JAM include JAM's Special Groups.

**B. Warnings and Counterterrorism Controls**

51. Beginning in 1995, the U.S. government and the international community began warning with increasing urgency about the Axis of Resistance and how doing business with IRGC-associated entities in Iran was funding and facilitating Iran's terrorist proxies.

52. In Executive Order 12957, President William J. Clinton found that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and he declared "a national emergency to deal with that threat." Through the issuance of Executive Order 12957 in March 1995 and Executive Order 12959 in May 1995, the President imposed comprehensive trade and financial sanctions on Iran. As President Clinton explained to Congress on September 18, 1995, "This action was in response to actions and policies of the Government of Iran, including support for international terrorism, efforts to undermine the Middle East peace process, and the acquisition of weapons of mass destruction and the means to deliver them." Warning of "Iran's continuing support for international terrorism," the President explained that comprehensive sanctions "advance[d] important objectives in promoting the nonproliferation and antiterrorism policies of the United States."

53. In a subsequent message to Congress on August 19, 1997, President Clinton explained that he was issuing another Executive Order (E.O. 13059) to "confirm[] that United States persons are prohibited from engaging in any trade- or investment-related activities with Iran." He added, "I want to make clear that this means all direct or indirect involvement in such

activities wherever those activities occur." In announcing the first-ever FTO designations, which included Hizballah, on October 8, 1997, U.S. Secretary of State Madeleine K. Albright framed the designations as a "recognition that terrorism is not a self-sustaining enterprise. It needs money and supplies to succeed."

54. In the wake of the terrorist attacks of September 11, 2001, the U.S. government singled out banks as crucial gatekeepers for maintaining the U.S. government's counterterrorism controls. Those controls had three key elements: (1) economic sanctions that prohibited certain transactions at high risk for terrorism financing; (2) review and reporting of suspicious transactions by banks under the Bank Secrecy Act (BSA); and (3) direct monitoring of banking transactions by the government.

55. As Congress explained in the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001, part of the USA PATRIOT Act, "defects in financial transparency" were "critical to the financing of global terrorism and the provision of funds for terrorist attacks."[34] The BSA, as strengthened by Congress in 2001, abolished bank secrecy by requiring banks to carefully monitor their customers' transactions and report any suspicious activity to Treasury's Financial Crimes Enforcement Network ("FinCEN"), which disseminated these reports to law enforcement and intelligence agencies. As the U.S. government warned in the wake of September 11, such reporting was particularly important for "correspondent banking" transactions, where a foreign bank enables its customers to access the U.S. financial system by sending their transactions through a U.S. bank or branch. As Congress emphasized in 2001 when it strengthened the BSA, "correspondent banking facilities are one of the banking

[34] 31 U.S.C. § 5311.

mechanisms susceptible in some circumstances to manipulation by foreign banks to permit the laundering of funds by hiding the identity of real parties in interest to financial transactions."[35]

56. BSA requirements and regulatory expectations are summarized in the Federal Financial Institutions Examination Council ("FFIEC") *Bank Secrecy Act (BSA) /Anti-Money Laundering (AML) Examination Manual* ("FFIEC Manual"), which was developed by federal and state banking agencies, FinCEN, and OFAC to provide guidance to banks and their examiners, and to ensure consistency in the application of BSA/AML requirements. The FFIEC Manual was first released in 2005, but it summarized requirements and expectations in effect since before 2001. The FFIEC Manual was commonly regarded by U.S. bank personnel as an authoritative source of guidance on BSA compliance. The FFIEC Manual explained that suspicious activity reporting was "critical to the United States' ability to utilize financial information to combat terrorism."

57. Under BSA regulations, banks were required to file a Suspicious Activity Report ("SAR") for any transaction conducted or attempted by, at, or through the bank (or an affiliate) and aggregating $5,000 or more, if the bank or affiliate knows, suspects, or has reason to suspect that the transaction involves money laundering or illegal activity. The FFIEC Manual emphasized that this included any suspected "terrorism financing." Indeed, the FFIEC Manual underscored the importance of this particular type of activity, warning:

> If a bank knows, suspects, or has reason to suspect that a customer may be linked to terrorist activity against the United States, the bank should immediately call FinCEN's Financial Institutions Terrorist Hotline at the toll-free number: 866-556-3974…. [T]he bank must also file a SAR.

[35] *Id.*

58. In an appendix entitled "Money Laundering and Terrorist Financing 'Red Flags,'" the FFIEC Manual listed examples of potentially suspicious activity that may indicate terrorist financing. This included "international transfers" to or from banks or persons "from high-risk locations," including Iran.

59. FinCEN explains on its website that BSA reports of such suspicious transactions have "proven to be of considerable value" in "terrorist financing . . . investigations by law enforcement."

60. In addition to receiving BSA reporting, another key counterterrorism control was the U.S. government's ongoing monitoring of payment messages sent through the Society for Worldwide Interbank Financial Telecommunication ("SWIFT") system. The SWIFT system was the primary means by which payments were processed through the international banking system. At all relevant times beginning in 2001, Treasury monitored SWIFT payment messages through its Terrorist Finance Tracking Program ("TFTP").

61. This program was revealed and widely publicized by the press in June 2006, including in a *New York Times* article by Eric Lichtblau and James Risen. Treasury also explained the program's history and importance on its website: "After the terrorist attacks on September 11, 2001," "[Treasury] initiated the Terrorist Finance Tracking Program (TFTP) to identify, track, and pursue terrorists—such as Al-Qaida, Hizballah, HAMAS and their networks. This was an important part of Treasury's larger effort to track terrorist money flows and assist in broader U.S. government efforts to uncover terrorist cells and map terrorist networks here at home and around the world." The TFTP "has provided hundreds of thousands of valuable leads to U.S. government agencies and other governments that have aided in the prevention or investigation of many of the most visible and violent terrorist attacks and attempted attacks of

the past decade…. SWIFT information greatly enhances our ability to map out terrorist networks, often filling in missing links in an investigative chain…. By following the money, the TFTP has allowed the United States and our allies to identify and locate operatives and their financiers, chart terrorist networks, and help keep money out of their hands."

62. To underscore the importance of BSA reporting and financial intelligence in countering terrorist attacks, President George W. Bush visited FinCEN on November 7, 2001, and gave a speech to "put the world's financial institutions on notice." He explained that the War on Terrorism was "not a war just of soldiers and aircraft. It's a war fought with diplomacy, by the investigations of law enforcement, by gathering intelligence and by cutting off the terrorists' money." He explained how certain terrorist facilitators "present[ed] themselves as legitimate businesses," but enabled "the proceeds of crime in one country to be transferred to pay for terrorist acts in another." President Bush did not mince words in delivering his "clear message to global financial institutions": "you are with us or you are with the terrorists. And if you're with the terrorists, you will face the consequences."

63. By early 2003, the U.S. government's intense focus on the importance of counterterrorism controls for global banks converged with its focus on Iran-backed terrorism. Treasury initiated a "Bad Bank Initiative" to expose Iranian banks that the IRGC was using to fund terrorism and to warn the international financial sector of the dangers of doing business in Iran. According to former Treasury Assistant Secretary for Terrorist Financing and Financial Crimes Juan C. Zarate in his 2013 memoir, *Treasury's War*, there was "direct and convincing evidence that [Iran's] Bank Saderat was being used as the bank of choice for transactions taking place between Iran and Hezbollah, with the branch in Beirut serving as the central conduit for support to Hezbollah's activities in Lebanon." Indeed, as Zarate explains, "We were not the only

ones to focus on Bank Saderat—this was a bank that Israel would consider bombing during its war with Hezbollah in 2006, considering its central importance to Hezbollah's financing." Treasury's Bad Bank Initiative also singled out Banks Melli, Mellat, and Sepah, and the Central Bank of Iran ("CBI/Markazi"), all four of which had engaged in terrorist financing and "served as facilitators of proliferation deals."

64. A major goal of Treasury's Bad Bank Initiative was to send "a clear message to others in the banking world," especially European banks like HypoVereinsbank. As Zarate explained, "[a]n argument would be made directly to banks and companies around the world that it was too risky to do business with Iran." On information and belief, HypoVereinsbank personnel repeatedly received this message when they met with Treasury officials, banking regulators, and others in the U.S. government. HypoVereinsbank also received this message through myriad public statements by U.S. government officials and press reports warning about the IRGC's use of economic activity in Iran to fund its terrorism.

**C. HypoVereinsbank's Special Money Laundering Services for Iran Clients**

65. Other global banks heeded the U.S. government's warnings. Most embraced the U.S. government's counterterrorism controls, and many stopped doing business with Iran entirely. But not HypoVereinsbank.

66. HypoVereinsbank had deep ties in Iran, serving Iranian banks and other clients there since opening its Tehran office in the 1970s.[36] Those relationships positioned HypoVereinsbank as a key conduit between Iran and the global banking system.

67. Beginning in the 1990s, as the U.S. government was imposing sanctions on Iran and sharply warning about its banks, HypoVereinsbank "understood" that "increased U.S.

[36] Statement of Offense ¶ 19.

sanctions on Iran would slow or stop its Iran-related transactions that cleared through the United States."[37] Instead of curtailing its Iran business, HypoVereinsbank viewed the shifting environment as an opportunity to grow it. As U.S. counterterrorism controls made it more difficult for Iran to use its banks to finance terrorism, HypoVereinsbank deepened its ties with Iran's banks and other favored Iranian clients (including IRISL, *infra*) by offering the most illicit and unusual service a bank could ever offer: secrecy.

68. On behalf of its favored Iran clients, HypoVereinsbank began to disguise the source and/or destination of USD wire transfers when payments were sent through the U.S. financial system. This entailed "overwriting sanctioned parties' names in SWIFT payment messages and omitting the names of sanctioned parties or countries from payment messages,"[38] which had the effect of disabling the counterterrorism controls that would have caused the transfers to be monitored, flagged, and reported. As the head of HypoVereinsbank's Tehran office described it, USD payments would be "stopped or even frozen if an Iranian beneficiary was named," so this was "avoided by a kind of 'gentlemen's agreement' in such a way that the payment was made through the USA without any reference to the beneficiary."[39] In other words, HypoVereinsbank laundered the payments for its favored Iran clients.

69. In 2004, as most global financial institutions adopted automated tools to detect and block prohibited transactions for Iranian beneficiaries, HypoVereinsbank established a policy to circumvent such systems, instructing bank employees to submit payment orders for the bank's favored Iran clients in an "OFAC-neutral" manner—a euphemism with "specific

[37] Statement of Offense ¶ 20.

[38] *Id.*

[39] *Id.*

meaning" at HypoVereinsbank.[40] For payments processed through U.S. banks, this euphemism meant "[e]nsuring that the OFAC background is not revealed in the correspondence/payments with U.S. Banks."[41] The policy instructed: "[I]f the involvement of a U.S. bank cannot be avoided . . . care must be taken to ensure that the OFAC background of the transaction does not become apparent."[42] This policy was created and implemented by a "Project Embargo" team whose steering committee was comprised of senior representatives from the bank's management board, the bank's general secretariat, the operating divisions, the legal department, and functional units.[43] The policy was set forth in a 59-page procedural manual titled "Transactions affected by OFAC," which emphasized that "U.S. banks ha[d] perceptibly increased the pressure regarding adherence to sanctions" and provided detailed instructions for how various "transactions that are desired for business reasons can be executed in an OFAC-neutral manner."[44]

70. As one employee explained the policy: "[The] basic idea is that . . . OFAC relevant transactions are carried out, but only in an OFAC neutral manner"—in other words, deceptively, to make Iranian beneficiaries sanctioned by OFAC appear "neutral."[45] As a member of the Project Embargo team described it, the "contracting party [would] be veiled if it appears on an OFAC list."[46] "There should be no publicity," the Project Embargo leader stressed in a April 2004 meeting discussing the policy.[47] As the same Project Embargo leader emphasized in a

---

[40] Statement of Offense ¶¶ 25-26; NYDFS Consent Order ¶¶ 12-13.

[41] NYDFS Consent Order ¶ 13.

[42] *Id.*; *see also* Statement of Offense ¶¶ 25-26, 30.

[43] OFAC Settlement Agreement ¶ 27.

[44] Statement of Offense ¶¶ 29-30.

[45] Statement of Offense ¶ 28; *see also* NYDFS Consent Order ¶ 14.

[46] Statement of Offense ¶ 26.

[47] NYDFS Consent Order ¶ 21.

July 2005 email to the bank's general secretariat: "The Americans do not become aware of anything if [HypoVereinsbank] conducts its business with Iran quietly and professionally."[48]

71. This service was offered only to the bank's most favored clients. In meetings leading up to the issuance of the "OFAC-neutral" policy, the Project Embargo team discussed "the need to find a way to continue to handle profitable Iranian business."[49] The Project Embargo leader subsequently directed "account managers . . . to select their business relationships. It is to be documented which profitable business they wish to continue with what customers. The remaining OFAC business relationships are to be terminated."[50] As the bank admitted in pleading guilty in 2019, the "OFAC-neutral" tactic was employed for those favored customers "to ensure that lucrative business was not affected by payments being stopped or frozen in the U.S. due to sanctions laws and regulations."[51]

72. HypoVereinsbank knew this conduct was illegal. As the Project Embargo leader stated during one meeting about implementing the "OFAC-neutral" process: "If OFAC/FED should ever focus on [HypoVereinsbank] here, unpleasant consequences could be expected."[52] Thus, when HypoVereinsbank was forced in April 2005, in response to concerns raised both internally and by an outside party, to solicit an opinion from a law firm in New York about the legality of continuing to do business with Iran, HypoVereinsbank concealed from the law firm

---

[48] NYDFS Consent Order ¶ 22.

[49] Statement of Offense ¶ 26.

[50] NYDFS Consent Order ¶ 21. *Accord* OFAC Settlement Agreement ¶ 30.

[51] Statement of Offense ¶ 31. Indeed, according to its Settlement Agreement with OFAC, UCB AG "considered conducting a cost-benefit analysis of its customers engaging in transactions relating to OFAC-sanctioned countries' and parties' activity to determine which customers were worth the potential liability issues and reputational harm" from clearing USD transactions for sanctioned parties through the United States. OFAC Settlement Agreement ¶ 30.

[52] NYDFS Consent Order ¶ 20.

the fact that it was clearing transactions with Iran through the United States and had specific, memorialized procedures designed to ensure that such transactions were not detected by banks in the United States.[53]

73. Beginning in 2006, the legal and compliance departments within HypoVereinsbank started raising concerns internally about "disguising" and "veiling" information in USD transactions cleared through the United States.[54] They continued to repeatedly raise these concerns through 2011, but the bank disregarded them. For example, in 2007, the bank's head Anti-Money Laundering (AML) officer formally informed the management board in that year's annual AML Report that transactions through "five accounts in the name of banks listed on the OFAC list" were being "carried out in an 'OFAC neutral' manner."[55] In another example in 2008, a member of the compliance team asked the head of credit risk management for "another presentation [to] be made to the [Credit Risk Committee] from the perspective of the [Sanctions Compliance Team]" regarding "Iranian customers," who "maintain US dollar balances in the amount of USD 37,398,604.88."[56] The compliance team member emphasized that this was "problematic" from "several points of view," including "[c]urrent US sanctions against Iran."[57] The compliance team's "recommendation" was "to give notice to such customers to close out their USD balances or convert them to other currencies."[58]

---

[53] Statement of Offense ¶ 33.

[54] Statement of Offense ¶ 34.

[55] NYDFS Consent Order ¶ 24.

[56] Statement of Offense ¶ 35.

[57] *Id.*

[58] *Id.*

74. By 2010, the compliance team was still raising concerns and was frustrated and alarmed by the bank's intransigence. The compliance officer complained to other senior employees in a February 2010 email that "[t]he Sanction Team [had] made various attempts in recent years to approach the Management Board . . . to discontinue the Iran business. However, it was decided to continue the business."[59] He added, "New customers who open accounts with us in order to handle their payments . . . are evidently welcome anytime."[60]

75. Those repeated entreaties from the bank's own compliance team were disregarded by the bank.[61] HypoVereinsbank continued its policy of disguising favored Iranian clients in USD payment messages, causing banks in the United States to process more than $5 billion in disguised payments involving sanctioned parties through 2011.[62] In light of HypoVereinsbank's admissions of wrongdoing, and its awareness of the dangers of serving these Iranian clients (as reported in U.S. designations and other public sources of which HypoVereinsbank was aware), this activity was not routine banking—but instead willful participation in terrorist finance.

## II. HypoVereinsbank's Money Laundering for IRISL Enabled the Supply of Weapons to Terrorists in Iraq.

76. One of HypoVereinsbank's most favored clients was at the heart of the Axis of Resistance: IRISL. As a primary means by which the IRGC secured components for weapons and supplied those weapons to its terrorist proxies, IRISL played an essential role in the weapons supply chain that armed Hizballah and JAM in Iraq. To do this, IRISL regularly and systematically hid weapons among ordinary cargo and carried them along ordinary shipping

---

[59] *Id.*

[60] *Id.*

[61] Statement of Offense ¶ 56.

[62] Statement of Offense ¶ 36.

routes, making them nearly impossible to interdict. The U.S. government and the international community thus determined that the only way to stop IRISL from supplying terrorists was to make it a pariah—cutting it off from the international shipping and financial systems and warning of the extreme and intolerable consequences of its continued operations.

77. HypoVereinsbank, however, never considered IRISL a pariah. To the bank, it was a favored client. HypoVereinsbank expressed its "desire for a closer relationship with the customer [IRISL]," and in late 2006 when other European banks were exiting or had exited their USD relationships with IRISL, HypoVereinsbank welcomed IRISL's desire to "expand our mutual business."[63] Rather than ending its relationship with IRISL when IRISL's systematic role as a terrorist supplier came into sharp focus, HypoVereinsbank doubled down in the most shocking way for a bank to behave: It implemented new and extraordinary measures to help IRISL hide its operations behind a veil of shell companies. In so doing, HypoVereinsbank knowingly thwarted counterterrorism efforts and sustained IRISL's continued supply of weapons to terrorists, especially Hizballah and JAM terrorists targeting Americans at that time in Iraq.

**A. IRISL's Worldwide Shipping Network Supplied Weapons to Terrorists.**

78. IRISL was essential to the IRGC's effort, through MODAFL, to procure weapons and their components from abroad, manufacture them in Iran, and supply them to Iran's terrorist proxies. As Treasury observed in a June 16, 2010, fact sheet, MODAFL "used IRISL to conceal the true destination of shipments of military-related goods destined for MODAFL."

79. Originally operating under the name Arya Shipping Lines, IRISL was renamed the "Islamic Republic of Iran Shipping Lines" after the Islamic Revolution and gave many of its ships names that referred to Iranian cities and "martyrs." One ship, the *MV Iran Sepah*, adopted

[63] Statement of Offense ¶ 41.

the name commonly used in Iran to refer to the IRGC. IRISL was wholly owned by the Iranian government until 2008, when a portion of its ownership was "privatized" though a stock exchange listing that put some of its shares in the hands of pension funds and other quasi-governmental entities. But at all relevant times, IRISL was under the *de facto* control of MODAFL and the IRGC.

80. IRISL was deeply enmeshed with MODAFL and operated as an IRGC front. It provided ships for IRGC operations, IRISL's crews aboard merchant vessels and working in foreign and domestic ports included IRGC intelligence officers, and IRISL functioned as the IRGC's and MODAFL's worldwide logistics arm. According to the U.S. government, "IRISL has long been Iran's preferred maritime carrier for sensitive shipments," including weapons.[64]

81. IRISL's dual role as a commercial shipper and IRGC logistics operator has been publicly known for decades. For example, after the IRGC and Hizballah orchestrated a notorious bombing of a Jewish community center in Argentina in 1994, killing 85 people, Argentine prosecutors determined that the explosives for the attack had been transported to Argentina by IRISL. As a prosecutor confirmed to *UPI Insight Magazine* on July 7, 2003, "The Iran Shipping Lines had a double purpose." "In addition to normal shipping activities," he explained, IRISL "assisted [Iranian intelligence officers] in logistics in the U.S. and Europe, and handled logistics of Hezbollah in South America."[65]

---

[64] U.S. Dep't of State, Cable, Missile Technology Control Regime (MTCR): Maritime Shipping Trends of Controlled Materials 2008-2009 (Sep. 29, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE101150_a.html. *Accord* U.S. Dep't of State, Fact Sheet, Designation of the Islamic Republic of Iran Shipping Lines, E-Sail Shipping Company Ltd, and Mahan Air (Dec. 11, 2019) ("The Islamic Republic of Iran Shipping Lines (IRISL) is the preferred shipping line for Iranian proliferators and procurement agents.").

[65] Kenneth R. Timmerman, *Evidence Fuels Iran Terror Debate*, Insight Magazine, June 28, 2003.

82. Most importantly, IRISL was essential to the ability of MODAFL and the IRGC to smuggle weapon components to Iran where they were manufactured or assembled, and then to distribute the weapons to their terrorist proxies. Weapons and their components were often difficult to move in large quantities by air or land, for both logistical and tactical reasons. Especially for large and heavy weapons such as rockets, mortars, and artillery, as well as their chemical precursors, maritime bulk transport was often the most efficient means of delivering them. In addition, obvious land and air routes were heavily monitored, entailing a significant risk that Iran's weapons shipments would be interdicted or exposed. The enormous scale of the maritime shipping industry solved those problems by enabling MODAFL and the IRGC to use the shipping of ordinary goods on large container ships transiting ordinary trade routes as camouflage to smuggle large quantities of weapons and their components. IRISL's size and global commercial operations have thus long enabled IRISL to move materials and arms for its terrorist proxies.

83. One frequent "inbound" shipping route involved moving Chinese and North Korean weapons, components, and precursor chemicals from Asia to Iran. In 2007, IRISL announced that it would triple its container capacity for shipping from Asia, with 11 ships transiting between ports in China and Southeast Asia, the Persian Gulf, and Europe. To move a large amount of precursors for explosives manufactured in China, the chemicals would, for example, be carried by IRISL on a common shipping route from Dalian, China through the Indian Ocean to Bandar Abbas, Iran, where MODAFL would then stockpile them and use them to produce the explosives in the rockets supplied to its terrorist proxies.

84. At the same time, IRISL enabled "outbound" shipping from MODAFL's stockpiles in Iran to terrorist proxies elsewhere in the Middle East. One frequent shipping route

involved moving weapons from ports in Iran to ports controlled by Iran-backed terrorists in Iraq, such as the port of Umm Qasr. Another frequent route involved shipping to Hizballah-controlled ports in Lebanon and Syria, where the weapons were then stockpiled by Hizballah, used to train Hizballah and JAM terrorists, and supplied to those terrorists for use in Iraq. But because direct shipments from Iran to these ports would be obvious targets for interdiction, IRISL used its multi-stop routes between Europe and the Middle East as camouflage. To move a large cache of weapons from Iran to Hizballah in Syria, the weapons would, for example, be loaded onto an IRISL container ship on a common shipping route from the Iranian port of Bandar Abbas, through the Suez Canal into the Mediterranean, and then through the Strait of Gibraltar to one of Europe's busiest ports in Hamburg; the weapons would then make a return voyage to the Mediterranean, where they would be delivered to the Syrian port of Latakia for Hizballah's use. Similar routes would be used to deliver weapons to Iraq, with IRISL often delivering cargo to busy ports in Dubai, whereupon smaller boats would take it through the Persian Gulf to Umm Qasr in Iraq.

85. The following map illustrates IRISL's routes through the Middle East, Europe, and Asia.




86. Essential to the success of these maritime smuggling routes was the camouflage afforded by IRISL's bulk shipment of ordinary goods. IRISL maintained a fleet of over 100 bulk cargo ships, in addition to leasing ships and paying other shippers to carry its cargo. IRISL cargo was typically moved worldwide in 20-foot containers like those shown below on an IRISL ship, the *MV Visea*.





87. Each ship carrying hundreds of containers of ordinary goods could accommodate dozens of containers of hidden weapons, with each container typically surrounding its illicit cargo with more ordinary goods, as shown in the sketch below.



88. These techniques for disguising illicit cargo succeeded because of lax security at many ports, combined with the sheer impossibility of searching every corner of every container on every massive cargo ship to pass through high-volume shipping hubs. As the U.S. government has assessed, "Numerous proliferators exploit the flexibility, speed, and perceived anonymity of the intermodal, or containerized, shipping system."[66] In addition to the "significant cost savings to shippers, especially in the transport of large or heavy materials," the use of containers "provides a greater degree of superficial anonymity to cargoes," which, "magnified by the sheer volume of containers, has been exploited by all kinds of nefarious actors," including those moving weapons in large quantities, for whom "maritime transportation remains a key method" on which they "rely heavily."[67] At the port of Dubai, for example, which is the hub for the exchange of goods between container ships and smaller commercial vessels ("dhows") that carry cargo to and from Iran, "Customs officers rarely make more than cursory inspections of

[66] U.S. Dep't of State, Cable, Missile Technology Control Regime (MTCR): Maritime Shipping Trends of Controlled Materials 2008-2009 (Sep. 29, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE101150_a.html

[67] *Id.*

dhows leaving for Iran."[68] Nor was it practicable to inspect all cargo entering high-volume ports like Umm Qasr,[69] which is Iraq's busiest commercial port, bringing in 80 to 90 percent of all its commercial goods, which amounted to 4.3 million tons of goods in 2005.[70]

89. IRISL's strategy for smuggling weapons was thus to hide them like needles in a haystack, confident that IRISL's large volume of ordinary shipments would make it nearly impossible to track and interdict the weapons hidden among them.

**B. The International Community Issued Numerous Warnings and Imposed Sanctions and Counterterrorism Controls to Stop IRISL from Supplying Weapons to Terrorists.**

90. By at least 2002, it was clear that Iran was using maritime shipping to deliver arms to its terrorist proxies. That reality became impossible to ignore when, on January 3, 2002, Israel interdicted a ship, the *Karine A*, loaded with Iran-supplied weapons destined for terrorists in Gaza. Hidden in crates beneath rice, toys, furniture, and other freight were thousands of rockets (122 and 107 mm), mortars, RPGs, mines, and assault rifles, along with 3,000 pounds of C4 explosives—enough for about 300 suicide bombs.

91. Using tactics IRISL would refine and repeat at greater scale in the coming years, the *Karine A* appeared to be carrying ordinary goods along normal shipping routes. In late 2001, the ship was renamed, registered in Tonga, and then sailed from Lebanon to Sudan, where it was

---

[68] U.S. Dep't of State, Cable, Iranian Dhow Trade with Dubai (Nov. 22, 2006), *available at* https://wikileaks.org/plusd/cables/06DUBAI6884_a.html.

[69] *See, e.g.*, U.S. Dep't of State, Cable, Major General Aziz Confident about Security but Acknowledges Some Violence Possible (Jan. 25, 2009), *available at* https://wikileaks.org/plusd/cables/09BASRAH2_a.html (warning that the flow of purportedly licit goods, particularly into the Umm Qasr port, creates "smuggling opportunities for lethal aid, including military hardware, ammunition, and expertise").

[70] Teri Weaver, *U.S. troops work to balance development, security at Iraq's busiest commercial port*, Stars and Stripes, May 28, 2009.

loaded with regular cargo. In December, the boat sailed around the Arabian Peninsula to Dubai. At some point while passing through the Strait of Hormuz, Hizballah and IRGC operatives on an Iranian ferry loaded the *Karine A* with 80 large wooden crates of Iran-supplied weapons. In Dubai, it was again loaded with ordinary cargo to camouflage the weapons and then sailed back around the Arabian Peninsula to Hodeida port in Yemen, aiming to pass through the Suez Canal and unload the weapons to fishing boats off the coast of Gaza. On January 3, 2002, in a startling raid on the Red Sea, Israel seized the *Karine A* and publicized its cargo:





92. The interdiction of the *Karine A* was widely covered in the international media, as it caused an "upheaval" in negotiations between Israel and the Palestinians.[71] It was a wake-up call demonstrating with unusually vivid proof how Iran and Hizballah were using maritime shipping to arm their proxies. As Vice President Cheney underscored to CNN on January 29, 2002, "What's most disturbing isn't just the shipment of arms, it's the fact that it came from Iran, apparently in conjunction with some activities of Hezbollah as well." The German press likewise

[71] Robert Satloff, *The Peace Process at Sea: The Karine-A Affair and the War on Terrorism*, Washington Institute for Near East Policy, May 1, 2002.

took note, reporting, "When the Israeli navy seized the ship *Karine A*, . . . the evidence of an Iranian rearmament during the Intifada was clearly visible to Jerusalem and Washington."[72]

93. Indeed, the *Karine A* was a proof-of-concept for the terrorists that marked the beginning of a strategic shift in which maritime shipping would be essential. According to a detailed account of the operation based on Israeli intelligence sources, it was a collaboration between the IRGC, Hizballah, and Palestinian terrorists that was masterminded by Hizballah terrorist chief Imad Mugniyeh (*supra* at 19-21) and directly managed by his deputy. The "Mugniyeh-IRGC plan" was to arm terrorists with rockets, which they envisioned as a "strategic game changer."[73] But rockets were heavy and difficult to move in large quantities, so maritime shipping was key. While Israeli intelligence went to extraordinary lengths to identify and surveil the *Karine A*, Mugniyeh knew that such efforts would be difficult to sustain. Accordingly, his "strategy with Iran was to keep smuggling a steady stream of weapons," on the assumption that many would escape interdiction.[74]

94. Having been involved in the Argentina bombing that used IRISL as cover to smuggle explosives far from Iran (*supra* at 34), Mugniyeh understood that IRISL's global shipping platform was the ideal vehicle for scaling-up their plans. In the years that followed, Iran and Hizballah used IRISL to dramatically increase their maritime weapons smuggling and

---

[72] *Our cause is just: If necessary, without Europe: America launches phase two of the war on terror*, Der Zeit, Feb. 7, 2002, *translated by Google*; *see also, e.g.*, *Deadly attack in the Gaza Strip: Six people are killed in a Palestinian attack on an Israeli military base*, Taz, Jan. 10, 2002 ("Last week, the ship 'Karine A' was hijacked in the Red Sea by a special Israeli naval commando unit carrying a cargo of 50 tons of military equipment, including rifles, ammunition, grenades, Katyusha rockets and anti-tank missiles."), *translated by Google*.

[73] Amos Gilboa, A Raid on the Red Sea: The Israeli Capture of the Karine A 15-16 (Potomac Books 2021).

[74] *Id*. at 19.

perfect their tactics. The IRGC's Unit 190, a special unit focused on supplying arms to terrorist proxies, developed sophisticated methods to conceal arms "inside containers next to other commonplace products" and send them on ships "to their recipients as innocuous commodities," sometimes "pass[ing] through three or more ports before reaching their final destination."[75] What began with the *Karine A* soon became ubiquitous. As one scholar observed, "Over the years, the scope of these transfers has proven to be massive, with Iranian weapons and explosives used in great quantity by Hezbollah . . . and Iraqi militias."[76]

95. As Iran's maritime smuggling accelerated, international concern grew. That concern became especially urgent in 2006, when Iran resumed uranium enrichment and the International Atomic Energy Agency ("IAEA") determined that Iran had failed to comply with its nuclear commitments. Iran's nuclear proliferation activities were deeply intertwined with its proliferation of conventional weapons to terrorist proxies. Iran's efforts to develop and improve missiles and rockets, for example, enabled it to develop the technology to deliver a nuclear warhead. Further, Iran's support of proxy terrorists, and their use of Iran-supplied weapons to target Americans and others, belied Iran's claim that its nuclear ambitions were peaceful. Alarm over Iran's nuclear program and longstanding concern over its supply of weapons to terrorists thus converged in a focused international effort to stop Iranian weapons smuggling.

96. Over the next two years, the international community and the U.S. government increased the frequency and volume of their warnings to European banks and others about the

---

[75] Nadav Pollak, *Rethinking U.S. Strategy for Intercepting Iranian arms Transfers*, Washington Institute for Near East Policy, Aug. 20, 2015.

[76] *Id.*

dangers of doing business with Iran, singling out Iran's illicit use of maritime shipping and its supply of weapons to its terrorist proxies.

97. The warnings began with the U.N. Security Council's adoption of Resolution 1737 on December 23, 2006. Expressing its determination "to constrain Iran's development of sensitive technologies in support of its nuclear and missile programmes" and concern for "proliferation risks," the Security Council directed all states to "take the necessary measures to prevent the supply, sale or transfer . . . using their flag vessels," of sensitive materials for the benefit of Iran. The Security Council also called on states to prevent related "financial assistance, investment, brokering or other services, and the transfer of financial resources or services, related to the supply, sale, transfer, manufacture or use" of sensitive materials to Iran.

98. A few months later, on March 24, 2007, the U.N. Security Council adopted Resolution 1747, expanding the embargo from certain sensitive materials to other arms and materials Iran was supplying to its terrorist proxies. The Security Council called upon states to "exercise vigilance and restraint . . . to prevent a destabilizing accumulation of arms" by Iran. To that end, the Security Council determined that "Iran shall not supply, sell or transfer . . . using its flag vessels . . . any arms or related materiel," and "all States shall prohibit the procurement of such items . . . using their flag vessels." The Security Council called for particular vigilance regarding the use of each state's "flag vessels" to transfer arms, including "artillery systems" (*i.e.*, rockets) and "missiles or missile systems," as well as related "financial assistance, investment, brokering or other services," to Iran. In the same Resolution, the Security Council singled out for special concern several IRGC commanders and entities, including Qasem Soleimani, the IRGC-QF commander who directed the supply of weapons to Iran's terrorist proxies, as well as an IRGC entity that "[p]roduces unmanned aerial vehicles (UAVs)" that the

IRGC "has boasted of using . . . as part of its asymmetric warfare doctrine" (*i.e.*, for proxy terrorist attacks).

99. Those Security Council resolutions coincided with an aggressive "financial pressure campaign," led by Treasury's Under Secretary for Terrorism and Financial Intelligence, which directly warned European banks like HypoVereinsbank in private. As former Treasury official Juan Zarate recounted in his memoir, Treasury's Under Secretary personally visited bank officials to "demonstrat[e] to CEOs and compliance officers around the world that the risk of doing business with Iran was too high." At each stop, he began with "a briefing on Iranian illicit activity and how it coursed through the international financial system" and gave them "briefing packets" with "information about how the Iranian government and the IRGC used front companies and obfuscation to finance and acquire what they needed for their military . . . apparatus." The fundamental message of the financial pressure campaign was: If you do business with Iranian companies in sectors controlled by the IRGC—even ostensibly legitimate transactions with business entities—you take on an unacceptable risk of supporting terrorist attacks by IRGC-funded proxies. As a large European bank that was doing business with Iran, HypoVereinsbank was, on information and belief, one of the banks that received these briefings.

100. In March 2007, the Deputy Treasury Secretary publicly reported, "We have . . . engaged in unprecedented outreach to the international private sector, meeting with more than 40 banks around the world to share information and discuss the risks of doing business with Iran." Explaining that most banks "want to identify and avoid dangerous or risky customers who could harm their reputations and business," he noted that several European banks were curtailing their business with Iran.

101. On May 9, 2007, at a press roundtable in Berlin, State Under Secretary Nicholas Burns publicly reiterated the message of the financial pressure campaign, warning that it was "no time for business as usual with . . . the leading supporter of the four major Middle East terrorist groups that Iran is." The German press confirmed that the U.S. government's message had been received in Germany. The German news magazine *Der Spiegel* reported in July 2007, "Anyone wishing to do business in the United States or hoping to attract US investors had best tread softly when it comes to Iran."[77] As one German banker told *Der Spiegel*, "Anti-terror officials from the US Treasury [Department] are constantly showing up to demand [German banks] cut their traditionally good relations with Iran. The underlying threat from the men from Washington is that they wouldn't want to support terrorism, would they?"[78]

102. On October 11, 2007, the Financial Action Task Force ("FATF"), a standard-setting body for the global financial system, issued a "statement of concern" in Paris, warning that Iran posed a "significant vulnerability within the international financial system" and advising banks to exercise "enhanced due diligence." This statement was circulated to HypoVereinsbank by German regulators, along with specific guidance informing HypoVereinsbank that the FATF statement legally obligates German banks to undertake additional due diligence on all Iran-related transactions. FinCEN likewise issued an advisory to banks on October 16, 2007, reiterating the FATF's warning and emphasizing that "all customers and transactions associated with Iran" warranted "enhanced scrutiny."

---

[77] Von Ralf Beste et al., *US Pressures Germany to Cut Iran Business Ties*, Der Spiegel, July 30, 2007.

[78] *Id.*

103. On October 25, 2007, as noted *supra*, the U.S. government sanctioned MODAFL and the IRGC. In these "major actions . . . to counter Iran's bid for nuclear capabilities and support for terrorism," the U.S. government also designated the IRGC's Qods Force; nine IRGC-affiliated firms; five IRGC leaders; and two more Iranian banks (Bank Mellat and Bank Melli) in addition to Bank Saderat. An accompanying fact sheet explained that these designations were "consistent with [FinCEN's] warning" to banks a week earlier, and were intended to "notify the international private sector of the dangers of doing business with . . . the many IRGC-affiliated companies that pervade several basic Iranian industries." The IRGC-QF, the fact sheet warned, "provides material support to . . . Lebanese Hizballah" and other terrorist organizations. This included "lethal support in the form of weapons, training, funding, and guidance to select groups of Iraqi Shi'a militants who target and kill Coalition and Iraqi forces" in Iraq and "guidance, funding weapons, intelligence, and logistical support" to "Hizballah's . . . terrorist activities" in Lebanon, Syria, Iraq, and Israel.

104. In an accompanying public statement, State Under Secretary Nicholas Burns emphasized that "Iran has transferred arms . . . to Hezbollah in Lebanon and to the Shia militant groups in Iraq." He added, "Iranian assistance to the Shia militant groups is providing the technology with which they then subsequently . . . attack American soldiers and kill and maim American soldiers. So that's a serious issue for us," in addition to Iran's nuclear proliferation. In another accompanying statement, the Treasury Secretary issued a warning directly to banks: "Today, we are taking additional steps to combat Iran's dangerous conduct and to engage financial institutions worldwide to make the most informed decisions about those with whom they choose to do business." The Treasury Secretary emphasized that "Iran exploits its global financial ties" and that the "IRGC is so deeply entrenched in Iran's economy and commercial

enterprises, it is increasingly likely that, if you are doing business with Iran, you are doing business with the IRGC." As this "awareness . . . has grown, many banks around the world have decided as a matter of prudence and integrity that Iran's business is simply not worth the risk. It is plain and simple: reputable institutions do not want to be the bankers for this dangerous regime." The Secretary of State reinforced the same message: "These actions will help to protect the international financial system from the illicit activities of the Iranian Government and they will provide a powerful deterrent to every international bank and company that thinks of doing business with the Iranian Government."

105. On November 10, 2007, in a press briefing after a meeting between the German Chancellor and the U.S. President, the U.S. National Security Advisor reported that "there have been steps taken by German banks, for example, to step away from Iran as the awareness has become more widespread that Iran is using banks, and sometimes its relationships with European banks, to basically launder funds that are used to support terror or for proliferation." In remarks to the European press in London on February 11, 2008, State Under Secretary Nicholas Burns similarly emphasized a "trend that has been apparent for about a year and a half" of "European banks that have either stopped lending altogether to Iran, or shut down their operations, or have diminished the operations in lending," which has been "probably the most effective leverage against Iran" and "for our international strategy of trying to prevent Iran from becoming even more destabilizing a force in the Middle East than it already is." He further emphasized Iran's "outright support in arming and funding most of the Middle East terrorist groups, from Hamas in Gaza to Hezbollah in Lebanon, to . . . the Shia militant groups in Iraq," and observed that "there's been universal, international condemnation of this Iranian policy to support the violent groups in the Middle East."

106. In early 2008, the Office of the Director of National Intelligence reported to Congress that "Iran continues to seek and acquire conventional weapons and production technologies, primarily from entities in Russia and China, as well as high-quality weapon components and dual-use items." Iran "has a history of supplying arms to Hizballah," including "many types of rockets," and "there has been a dramatic increase in Iranian weapon and weapon system shipments through Syria, with transfers continuing even after the outbreak of hostilities with Israel in July 2006." The report assessed a "strong possibility that Iranian proliferation will continue to be a destabilizing force in the Middle East."

107. On March 3, 2008, the U.N. Security Council adopted Resolution 1803, which drew specific attention to IRISL's role in Iran's proliferation. It called upon all states to "inspect the cargoes to and from Iran" of vessels at their seaports "owned or operated by . . . Islamic Republic of Iran Shipping Line." In implementing this resolution, the U.S. government specifically urged states to "exercise vigilance with regard to all IRISL-related transport of goods through your jurisdiction, and any financial support for those transfers."[79]

108. It quickly became clear, however, that inspections and interdictions were not enough to stop IRISL from continuing to smuggle weapons under the guise of ordinary shipping. The international community recognized that the instances in which IRISL had been caught were only the tip of the iceberg, and that the true scale of IRISL's weapons smuggling from Asia to Iran and from Iran to terrorist proxies throughout the Middle East was enormous. Moreover, it was the camouflage created by IRISL's worldwide shipment of ordinary goods that made it difficult to identify and stop the weapons hidden among them. Given that IRISL's worldwide

[79] U.S. Dep't of State, Cable, Implementation of the IRISL Cargo Inspection Provision of UNSCR 1803 (June 27, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE69339_a.html

shipping activity was so permeated with weapons smuggling and its illicit cargo was so difficult to detect, the U.S. government determined that all of IRISL's shipping activity had to be stopped.

109. Accordingly, on September 10, 2008, the U.S. government sanctioned IRISL, aiming to shut down its shipping operations by cutting it off from the U.S. financial and commercial system. The sanctions announcement explained: "IRISL is Iran's national maritime carrier; a global operator with a worldwide network of subsidiaries, branch offices and agent relationships. It provides a variety of maritime transport services, including bulk, break-bulk, cargo and containerized shipping. These services connect Iranian exporters and importers with South America, Europe, the Middle East, Asia, and Africa." But at the same time, IRISL "provides logistical services to Iran's MODAFL" by "facilitat[ing] shipments of military-related cargo destined for MODAFL and its subordinate entities. . . . For example, in 2007, IRISL transported a shipment of a precursor chemical destined for use in Iran's missile program." And "[i]n order to ensure the successful delivery" of such goods, "IRISL has deliberately misled maritime authorities through the use of deception techniques . . . to conceal the true nature of shipments ultimately destined for MODAFL." For example, "IRISL has employed the use of generic terms to describe shipments so as not to attract the attention of shipping authorities and created and made use of cover entities to conduct official, IRISL business." In an accompanying press briefing, a Treasury official emphasized that "IRISL's deceptive conduct makes it nearly impossible to determine whether its shipments are licit or illicit," and he warned that the publicly available information about IRISL's illicit shipments—shocking as it was—constituted only "a subset of what we're able to identify in classified information."

110. The September 10, 2008, announcement made clear that this was a present and ongoing threat, as "IRISL has pursued new strategies, which could afford it the potential to

evade future detection of military shipments." The announcement explained that IRISL's designation was intended to "highlight the dangers of doing business with IRISL," which would entail "helping the shipping line facilitate Iran's proliferation activities." These dangers, the U.S. government warned, "should give pause to any financial institution." In the accompanying press briefing, the Treasury official emphasized that the action against IRISL should be viewed in the "broader context of the U.S. Government's activities with respect to Iran," which is "continuing to pursue nuclear capabilities, develop ballistic missiles, and support terrorism."

111. In addition to designating the main IRISL entity headquartered in Iran, the September 10, 2008, announcement "highlight[ed] the dangers of doing business with . . . [IRISL's] subsidiaries." The U.S. government sanctioned 18 IRISL affiliates in Europe, Asia, and Iran, including IRISL Europe GMBH in Hamburg, Irinvestship Ltd. in London, IRISL (UK) Ltd. in Essex, Irital Shipping SRL Co. in Genova, IRISL Benelux NV in Antwerp, and IRISL (Malta) Ltd. in Malta. These IRISL affiliates were part of IRISL's "deceptive schemes to shroud its involvement in illicit commerce," while "providing logistical services to Iran's MODAFL." By exposing the affiliates through which IRISL operated, the U.S. government aimed to put legitimate operators in the shipping industry on notice. As the Treasury official explained in the accompanying press briefing, for example, maritime insurance companies needed to exercise "extreme diligence." Banks issuing letters of credit for maritime shipments were likewise put on notice. As the U.S. government explained to its allies and partners, IRISL had "directed its international offices to obtain and use deceptive documents—including false bills of lading that

remove references to IRISL and the Iranian recipient—to negotiate letters of credit with banks refusing to deal with Iranian entities."[80]

112. The U.S. government expressed confidence that its counterterrorism controls and warnings would stop IRISL's weapons smuggling by shutting it out of the international financial system on which it depended for its global operations. A Treasury official warned that the U.S. government would be monitoring IRISL transactions through its counterterrorism controls in the banking system (*supra* at 23-26), explaining, "if somebody is wiring money to IRISL as of 1:30 today [after the sanctions are imposed] and it's going between two foreign countries but it happens to be in U.S. dollars, it happens to be transiting the U.S. financial system, even for an instant, it'll be caught in a bank's filter, most likely, and we'll receive a notification of that."

113. Later, in a November 6, 2008 statement, Treasury's Under Secretary recalled that, since 2006, the U.S. government had engaged in "a campaign to warn the world about how Iran's threat to our security also posed a threat to the integrity of the international financial system." Since that time, the U.S. government had "shared information with . . . financial institutions . . . demonstrating that even seemingly benign business with Iran should be cause for concern." Iran "misuses bank accounts it holds in non-Iranian banks." As a result, "many private financial institutions and companies worldwide have voluntarily shunned business with Iran." He added, "Banks see Iran's behavior as posing an unacceptable risk to their reputations, and they would rather forgo the business and preserve their integrity."

---

[80] U.S. Dep't of State, Cable, Implementation of the IRISL Cargo Inspection Provision of UNSCR 1803 (June 27, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE69339_a.html.

### C. HypoVereinsbank Laundered IRISL's Payments in Defiance of Sanctions and Counterterrorism Controls.

114. While the U.S. government could count on most banks to stop IRISL, the Iranians counted on HypoVereinsbank to shield it. As a senior IRISL manager explained in an email to a confidant, HypoVereinsbank was more "easygoing than others," and his confidant agreed, remarking that it was one bank "still 'working with Iran.'"[81]

115. Indeed, that was an understatement, as HypoVereinsbank was eager for IRISL's business. As most other European banks were exiting their U.S. dollar relationships with IRISL in 2006 while concern mounted about IRISL's weapons smuggling, HypoVereinsbank expressed a "desire for a closer relationship with the customer [IRISL]" and agreed with IRISL to "expand our mutual business."[82] HypoVereinsbank was aware at the time that the U.S. government's warnings and counterterrorism controls were causing IRISL's payments to be rejected, so it began scheming with IRISL to launder them.

116. Specifically, HypoVereinsbank crafted a bespoke money laundering arrangement for IRISL, which HypoVereinsbank referred to as the "Safe Accounts" process.[83] Under this arrangement, HypoVereinsbank opened accounts for IRISL shell companies registered in places like the Isle of Man and arranged for payments to and from IRISL to be routed through these "Safe Accounts."[84] Since only HypoVereinsbank would know that the shell companies were operating on behalf of IRISL, U.S. sanctions filters would not catch the payments through their accounts. The bank employed those "Safe Accounts" in combination with a second feature it

---

[81] Statement of Offense ¶ 58.

[82] Statement of Offense ¶ 41.

[83] Statement of Offense ¶¶ 40-42.

[84] *Id.*

called "AutoDispo," whereby payments through the USD "Safe Accounts" of the shell companies would automatically be transferred on a book-entry basis to accounts held by IRISL at HypoVereinsbank. In other words, IRISL could send and receive USD payments using the shell company "Safe Accounts" without U.S. financial institutions knowing that IRISL was behind the payments, and those payments would seamlessly and covertly flow into IRISL's main accounts at the bank.[85]

117. This arrangement required special handling and coordination by HypoVereinsbank to maintain secrecy. As HypoVereinsbank's relationship manager assured IRISL, "[I]n the most cases, the data of the payment will be send [sic] coded to [the U.S. Bank]" (*i.e.*, hidden from the U.S. bank), but "[w]e request you as a precaution, to co-ordinate according payments with us in advance."[86] HypoVereinsbank took pains to remove references to IRISL from any message sent to U.S. banks to "ensure" that information about the true beneficiary of the transactions was "not transmitted to [the U.S. banks]."[87] As HypoVereinsbank's correspondent banking relationship manager for the Middle East region confirmed in a June 2008 email to the head of correspondent banking in Milan for the UniCredit group, HypoVereinsbank ensured for USD payments on behalf of IRISL that "there is no relationship to Iran" in the SWIFT messages sent through the United States.[88]

118. This arrangement was elaborate in scale. Between 2004 and 2011, HypoVereinsbank opened l79 commercial bank accounts for 55 different IRISL entities,

[85] Statement of Offense ¶ 40.

[86] *Id.*

[87] Statement of Offense ¶ 42.

[88] *Id.*

including 62 USD accounts.[89] For example, between 2004 and 2008, HypoVereinsbank opened five USD accounts for an IRISL shell company called "Ashtead Shipping Company Limited," two of which were connected to the main USD accounts HypoVereinsbank maintained for IRISL through the AutoDispo arrangement.[90] Other IRISL shell companies in whose names HypoVereinsbank opened "Safe Accounts" included "Adara Shipping," "Byfleet Shipping Company Limited," "Cobham Shipping," "Dorking Shipping," "Effingham Shipping," "Extrim Shipping," "Fairway Shipping Limited," "Farnham Shipping," and "Hanseatic Trade Trust & Shipping GmbH (HTTS)."[91] These innocuous-sounding shell companies did not reference IRISL in their names, making them appear to those outside HypoVereinsbank as though they were unrelated to IRISL.

119. HypoVereinsbank designed its arrangement with IRISL specifically to help IRISL evade the automatic systems that most financial institutions were implementing to detect and block financial transactions involving Iranian entities. For example, in June 2008, a HypoVereinsbank relationship manager for IRISL sent an email to an IRISL official informing him that one of IRISL's payments had been stopped and returned based on sanctions. In less than

---

[89] Statement of Offense ¶ 37.

[90] OFAC Settlement Agreement ¶ 17.

[91] *See generally* OFAC Settlement Agreement. OFAC subsequently designated almost all of these companies and/or confirmed in other public findings that they were "IRISL front companies." *See* U.S. Dep't of Treasury, Non-proliferation Designations (Oct. 27, 2010) (designating HTTS); U.S. Dep't of Treasury, Treasury Targets Corporate Structures of the Islamic Republic of Iran Shipping Lines and Iran's Bank Mellat (Nov. 30, 2010) (designating Ashtead, Byfleet, Cobham, Dorking, Effingham, and Farnham in November 2010); U.S. Dep't of Treasury, Non-proliferation Designations (June 20, 2011) (designating Fairway); U.S. Dep't of Treasury, Settlement Agreement with Commerzbank AG (Mar. 11, 2025), *available at* https://ofac.treasury.gov/media/12311/download?inline. *Accord Companies Linked to IRISL*, N.Y. Times, June 8, 2010. Some of the IRISL ships "owned" by these shell companies were also specifically designated by OFAC during the relevant time period.

two weeks, IRISL then created a new shell company and HypoVereinsbank immediately opened a new account for the shell company with the same address and signatory, and with IRISL having power of attorney over the account.[92] Likewise, in a July 2009 email exchange available to HypoVereinsbank, IRISL employees referenced the account for one of their shell companies as "our nominate account" (i.e., an account operated on behalf of IRISL) and instructed a customer to correct the routing of a payment so that it was sent to the shell company account instead of directly to IRISL. The email instructed: **"please don't mention name of IRISL/vessel/line/voyage in your payment**."[93]

120. Through its "Safe Accounts" and "AutoDispo" arrangement with IRISL, HypoVereinsbank conspired with IRISL to hide IRISL's payments behind a false façade. To the outside world, IRISL's various shell companies did not appear to be affiliated with a shipping company that was a pariah for arming terrorists. But hidden inside the bank, HypoVereinsbank maintained the secret system that enabled IRISL to operate through those shell companies. In doing so, HypoVereinsbank and IRISL formed a near-common enterprise focused on shielding IRISL's shell companies from scrutiny by counterparties in the shipping industry, U.S. compliance officials, and counterterrorism authorities.

121. On September 10, 2008, OFAC specifically sanctioned IRISL and several of its affiliates, including IRISL's UK branch, its European office, and numerous IRISL vessels, prohibiting all transactions with them and leaving absolutely no doubt that business with IRISL had to be stopped in its entirety (*supra* at 49-50).

---

[92] Statement of Offense ¶ 43.

[93] OFAC Settlement Agreement ¶ 18 (emphasis in original).

122. HypoVereinsbank received this message and understood it. The very day that the U.S. sanctioned IRISL, Treasury Under Secretary Stuart Levey met with representatives of HypoVereinsbank's affiliate, UniCredit Bank Austria AG, along with other Austrian bank representatives and financial regulators, and personally raised the U.S. government's concerns about IRISL's repeated efforts to conceal weapons smuggling.[94] The day after the OFAC designation, a sanctions compliance employee at HypoVereinsbank emailed the head of the bank's international legal department seeking advice on how to proceed with financial transactions on behalf of IRISL entities. The legal department head responded, copying other legal and compliance personnel, including the head of sanctions compliance: "[I]t is out of the question that we continue to carry out USD transactions with these companies."[95] Four days later, on September 15, 2008, a sanctions compliance officer sent an email to the bank's IRISL relationship management team, copying senior compliance and legal personnel, stating that the designation of IRISL "contains the names of companies and persons who are considered to be linked to weapons of mass destruction," and that because "this regulation has direct extraterritorial effect on us," the sanctions compliance teams had "reached the following decision: Effective immediately, USD payments may no longer be executed or accepted for the customer [IRISL]."[96] The sanctions compliance team then attempted to elevate the issue to the bank's management and executive boards.

123. But despite these grave and emphatic warnings from legal and compliance officials within the bank, HypoVereinsbank's leadership chose to disregard them and continue its

---

[94] U.S. Dep't of State, Cable, Treasury U-S Levey Talks Iran With Austrian Regulators, Banks (Sep. 24, 2008), *available at* https://wikileaks.org/plusd/cables/08VIENNA1414_a.html.

[95] Statement of Offense ¶ 45.

[96] Statement of Offense ¶ 47.

profitable relationship with IRISL for nearly two more years.[97] As the head of the department overseeing the bank's IRISL relationship wrote in an email rebuffing the warnings: "[F]or your information, this engagement represents a gross contribution of almost 1 million Euros as of August 31, 2008. That certainly hurts and we hope that we can generally continue the very successful relationship. If the relationship were terminated, this would ultimately result in unfavorable consequences on the revenue side for 2009."[98] Thus, even after it was unmistakable to HypoVereinsbank that IRISL played a major role in supplying weapons to terrorists, bank officials regarded the bank's relationship with IRISL as "very successful" and were determined to continue it.

124. To do so, they went to even greater lengths to hide IRISL from scrutiny. As of September 10, 2008, HypoVereinsbank maintained accounts for approximately 34 IRISL entities linked together under one customer group number, known within the bank as an "EVD" number.[99] But by September 20, 2008, at the behest of the bank's IRISL relationship team, HypoVereinsbank removed the new shell company that IRISL had created in June 2008 from the IRISL customer group and assigned it a separate EVD number, thereby falsifying its own records to make it appear as though the entity—which had the same address, signatory, and power of attorney as IRISL (*supra* at 54-55)—was unrelated to IRISL.[100]

125. HypoVereinsbank also took greater steps to hide information about IRISL's transactions from U.S. banks and counterterrorism officials. In December 2008, for example, a

---

[97] Statement of Offense ¶ 52.

[98] Statement of Offense ¶ 48.

[99] Statement of Offense ¶ 45; OFAC Settlement Agreement ¶¶ 8-9.

[100] Statement of Offense ¶ 49.

U.S. correspondent bank unwittingly processing payments for one of IRISL's shell companies noticed that the payment messages referenced the phrase "crew wages."[101] HypoVereinsbank determined that these payments related to crews working on IRISL vessels, including specific vessels that had been identified in OFAC's sanctions announcement. So, to maintain secrecy for IRISL, a HypoVereinsbank compliance officer emailed the service provider that managed the bank's payment processing function on January 15, 2009, with instructions to provide the U.S. bank with details regarding a particular payment about which it had inquired, but the compliance officer added that "the details of the ship (M.v. Diamond) may not be transmitted [to the U.S. bank] under any circumstances (OFAC listed)."[102] The next month, HypoVereinsbank rejected several payments for the IRISL shell company that referenced "crew wages" due to their "higher risk profile."[103] But HypoVereinsbank appeared to be concerned only with the risk of getting caught; the bank continued processing other payments for IRISL through this shell company for nearly two more years.[104]

126. Over the next two years, HypoVereinsbank's compliance officers kept raising concerns about the IRISL relationship, and the bank's leadership kept disregarding them. Indeed, HypoVereinsbank decided to give IRISL a covert lifeline at a time when it knew that nearly all other banks were refusing to handle IRISL's transactions. In September 2008, for example, a compliance officer raised concern about a Euro transfer for an IRISL entity involving a U.S. bank, to which the compliance officer was told, "[o]ur client unfortunately has no other bank

---

[101] OFAC Settlement Agreement ¶ 20.

[102] *Id.*

[103] OFAC Settlement Agreement ¶ 21.

[104] *Id.*

connection to the recipient" of the payment.[105] The compliance officer responded, "Okay, we'll do it (with a stomach ache)."[106]

127. In November 2008, a compliance officer emailed the bank's IRISL relationship team, confirming that "in a telephone conversation with an [IRISL relationship manager] today, I was advised of the current status of the [IRISL] engagement which I would like to summarize as follows: US-Dollar credit balances were mainly converted into Euros. The US-Dollar accounts still exist, but they are kept at 'zero.'"[107] This appeared to be yet another effort to hide IRISL's USD transactions in the bank's own records by regularly sweeping funds out of IRISL's USD accounts so the balances would give the impression that they were unused. In fact, HypoVereinsbank would continue to process U.S. dollar payments for IRISL entities for nearly two more years.[108]

128. HypoVereinsbank even continued to open new accounts for IRISL shell companies. In a July 16, 2009, email to an individual with an IRISL email address, for example, an IRISL relationship manager at the bank confirmed a new account opening, stating, "[a]s discussed over the phone, please find attached the . . . account opening documents" for an IRISL entity.[109] The account opening documents listed a senior IRISL employee as the sole "owner" of the entity and gave IRISL power of attorney over the account.[110] As another example,

---

[105] Statement of Offense ¶ 50.

[106] *Id.*

[107] Statement of Offense ¶ 51.

[108] Statement of Offense ¶ 52.

[109] Statement of Offense ¶ 53.

[110] *Id.*

HypoVereinsbank opened nine new USD accounts over the course of the rest of 2009 for another IRISL shell company, HTTS, which the bank knew was controlled by IRISL.[111]

129. On November 10, 2009, a HypoVereinsbank compliance officer sent an email to the two senior reputational risk officers at the bank attaching a news article about IRISL. On information and belief, this news article reported on the startling interdiction on November 3, 2009, of an IRISL shipment containing thousands of rockets, mortars, and ammunition destined for Hizballah terrorists. *See infra* at 67-69. In light of this widely publicized news, the compliance officer stated, “In my opinion, the customer relationship [with IRISL] should be reviewed from a reputational point of view.”[112] A few weeks later, one of the reputational risk officers wrote to the bank’s IRISL relationship manager, stating, “The reputational risk is too high for the bank.”[113] The reputational risk officer claimed in his email that the bank’s management had “decided that we cannot continue our customer relationship [with IRISL] unless the customer can establish transparency about which good[s] are being transported on its ships”—an impossible expectation.[114] Yet the bank’s management did not effectuate any decision to end its IRISL relationship for more than a year.[115]

130. On information and belief, HypoVereinsbank’s management chose to delay implementing any decision to end its IRISL relationship because of the revenue it was continuing to generate for the bank. The potential financial consequence of ending the relationship evidently gave HypoVereinsbank more pause than the reputational risk of continuing to support IRISL as it

[111] OFAC Settlement Agreement ¶ 22.

[112] Statement of Offense ¶ 55.

[113] *Id.*

[114] *Id.*

[115] *Id.*

supplied weapons to terrorists. And the consequence for the victims of those terrorists appears to have given HypoVereinsbank no pause at all.

131. Six weeks after circulating the news article about IRISL and warning of reputational risks, the compliance officer raised the same concerns again in a January 11, 2010, email to the reputational risk officer, asking, "How do we handle the companies/participations with respect to which we know that IRISL has a substantial interest?"[116] In later interviews with law enforcement, the compliance officer described this email as "a cry for help" from the sanctions compliance team because the bank's IRISL business had not ceased even after being confronted with news articles about how IRISL supplied weapons to terrorists.[117] The next month, the compliance officer reiterated his cry for help, noting in a February 2010 email that the compliance team had "made various attempts in recent years to approach the Management Board of [the bank] to discontinue the Iran business. However, it was decided to continue the business . . . ."[118] The compliance officer was frustrated with management because he and his team had attempted to elevate the same issue regarding IRISL over and over again with no response, causing him concern about his team's credibility within the bank.[119] As HypoVereinsbank's leadership and relationship managers continued to disregard the concerns of its compliance team, the compliance team understood that it had no real authority to direct or discipline the team that maintained the bank's relationship with IRISL.

---

[116] Statement of Offense ¶ 56.

[117] *Id.*

[118] Statement of Offense ¶ 57.

[119] *Id.*

132. HypoVereinsbank continued its relationship with IRISL through at least 2011.[120] In total, between 2006 and 2011, HypoVereinsbank processed approximately $320 million in USD payments on behalf of IRISL and its shell companies through financial institutions located in the United States, with approximately $275.5 million of those transactions occurring after the September 2008 sanctions announcement.[121] Moreover, on information and belief, HypoVereinsbank also assisted IRISL via accounts for IRISL and its deceptive web of shell companies held in other currencies through at least 2011.

133. HypoVereinsbank knew that payments it laundered for IRISL were illegal. As HypoVereinsbank admitted in its guilty plea, those payments not only violated sanctions laws but also "caused false entries to be made in the business records of financial institutions located in New York," in violation of New York law.[122] HypoVereinsbank admitted that it "knowingly and willfully conspired to violate United States and New York State laws by processing U.S. dollar transactions through the United States on behalf of customers located or doing business in Iran and other countries subject to U.S. economic sanctions, causing financial services to be exported from the United States to Iran and elsewhere in violation of U.S. sanctions laws and regulations."[123]

[120] Statement of Offense ¶ 64.

[121] Statement of Offense ¶ 65. UniCredit admitted in its settlement agreement with OFAC that it processed 1,879 electronic funds transfers in the aggregate amount of $287,807,794 through the United States between October 26, 2007 and September 30, 2011 that violated sanctions and appear to be associated with IRISL. OFAC Settlement Agreement ¶ 35.

[122] Statement of Offense ¶ 65.

[123] Statement of Offense ¶ 2.

**D. HypoVereinsbank Sustained IRISL's Operations Through 2011, Enabling it to Keep Supplying Weapons to Terrorists.**

134. Unfortunately for the Plaintiffs in this case, the U.N. and U.S. sanctions failed to stop IRISL. With HypoVereinsbank's vital help, IRISL was able to employ more camouflage that enabled it to continue its global operations, continuing to ship hidden weapons to terrorists for the next several years. As U.S. Secretary of State Condoleezza Rice told the U.N. Security Council on December 10, 2009, "We must ensure that these sanctions [on IRISL] are rigorously enforced to ensure that destabilizing weapons are not allowed to flow from Iran to other parts of the Middle East . . . ." And because banks play an integral role in maritime shipping, the U.S. government believed that "banks are in a key position to detect the movement of cargoes on IRISL ships," to "reject any fund transfers involving [IRISL] vessels or entities," and to "effectively restrict[] IRISL from doing business in U.S. dollars."[124] Banks were the crucial gatekeepers to stop the flow of weapons through IRISL. But with a willing banker in HypoVereinsbank committed to helping it disguise itself, IRISL kept operating and the weapons kept flowing.

135. With HypoVereinsbank's indispensable assistance, IRISL hid its operations behind a veil of shell companies. As the U.N. Panel of Experts reported in 2012, the arms embargo was "difficult to implement because of actions by the Islamic Republic of Iran Shipping Lines, following the adoption of resolution 1803 (2008), to modify regularly its corporate ownership structure and the names and flags of its vessels."[125] These activities, according to the

---

[124] U.S. Dep't of State, Cable, Iranian Shipping in a Post-UNSCR 1803 Environment (Oct. 2, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE102919_a.html.

[125] U.N. Security Council, Final Report of the Panel of Experts Established Pursuant to Resolution 1929 (2010), June 4, 2012, at 36.

report, "introduced a complex and amorphous structure to the Islamic Republic of Iran Shipping Lines that serve[d] to obscure its activities as a whole and the identities of individual vessels."[126] As a *Reuters* investigation uncovered in 2012, IRISL had changed the name, flag, or ownership of its fleet 878 times since October 2008.[127] Those tactics meant that "despite the sanctions 130 of the 144 banned ships in IRISL's fleet continue[d] to call at many of the world's major ports hidden behind a web of shell companies and diverse ownership."[128] "Dozens of Iranian ships have used Singapore several hundred times in the past two years, for instance, as a stop-off on their way to other destinations such as China."[129] Similarly, in 2012, "[t]wenty three sanctioned Iranian ships ha[d] visited 12 EU ports since July 2010," and "IRISL containers could be seen stacked on the concrete yards of [Malta's] Freeport."[130] Based on reporting from Western and Middle Eastern intelligence agencies, the Iranians in 2010 "boasted that the West had only discovered half of the shell companies and front individuals it used."[131] The undiscovered shell companies included those HypoVereinsbank continued to use to process Safe Payments for IRISL through 2011.

136. As HypoVereinsbank kept IRISL operating behind a veil of shell companies, the consequences were illustrated in technicolor visuals for the world to see.

---

[126] *Id*. at 37.

[127] Rachel Armstrong, et al., *Iran's Global Cat-and-Mouse Game on Sanctions*, Reuters, Feb. 15, 2012; *see also Web of Shell Companies Veils Trade by Iran's Ships*, N.Y. Times, June 7, 2010.

[128] Rachel Armstrong, et al., *Iran's Global Cat-and-Mouse Game on Sanctions*, Reuters, Feb. 15, 2012.

[129] *Id*.

[130] *Id*.

[131] *Id*.

137. In January 2009, a Cypriot-flagged ship leased and operated by IRISL, the *M/V Monchegorsk* (shown below), was seized by U.S. naval forces in the Red Sea while sailing from Iran's port of Bandar Abbas to Latakia, Syria.[132]



138. Hidden in the *Monchegorsk*'s 98 shipping containers were artillery and mortar shells, black powder, and materials for producing rockets. According to a January 22, 2009, State cable released by *Wikileaks*, IRISL's cargo on the *Monchegorsk* included "120 mm, 122 mm, 125 mm, and 160 mm high explosives that originated in Iran," as well as "7.62 mm shell casings, compressed gunpowder, silver dollar-sized slugs, primer, and magnesium primers," all of which, according to a scholar, were being delivered "most likely to Hezbollah."[133]

[132] *See, e.g.*, *UN action urged over Iran arms ship*, Al Jazeera, Mar. 11, 2009.

[133] U.S. Senate, Comm. on Banking, Housing, and Urban Affairs, Hearing, Minimizing Potential Threats from Iran: Assessing Economic Sanctions and Other U.S. Policy Options, Prepared Statement of Danielle Pletka (July 30, 2009).

139. A few months later, in October 2009, a German-flagged ship, the *M/V Hansa India* (shown below), was seized while sailing from Iran to Latakia, Syria. The *Hansa India*'s cargo included eight containers full of 7.62 mm bullet casings and cartridges. This ship, which IRISL frequently used, was leased by IRISL from a German company based in Hamburg. On October 12, 2009, the German newsweekly *Der Spiegel* reported that the *Hansa India* "part of an Iranian shipment bound for either the Syrian army or for Hezbollah, the militant Islamist group."[134]







140. That same month, an IRISL ship, the *M/V Visea* (below left)—a ship owned by IRISL shell company and HypoVereinsbank "Safe Account" holder Byfleet—sailed from Bandar Abbas, Iran to the port of Damietta, Egypt, where another ship owned and operated by German firms, the *M/V Francop* (below right), picked up IRISL's cargo for delivery to Syria, by way of Cyprus.

[134] *German Ship Transporting Arms for Iran*, Der Spiegel, Oct. 12, 2009.






141. The *Francop*'s shipping manifest claimed IRISL's cargo consisted of 24,228 bags of polyethylene, ordinary goods commonly used in consumer packaging. But when the shipment was seized en route by the Israeli military on November 3, 2009, 36 of IRISL's 400 containers were found to contain munitions destined for Hizballah hidden behind bags of polyethylene.













142. The following photograph shows the way the munitions were concealed:




143. The munitions seized from the *Francop* included 2,815 rockets (107 and 122 mm), 685 rocket fuzes, 8,770 mortar shells (60, 81, and 120 mm), 20,100 grenades, and 566,220 bullets (7.62 mm). The munitions crates were stamped "IRISL," and contained documentation bearing the IRGC's logo and indicating that they were manufactured by Iran between 2007 and 2009. The Government of Israel determined that the 107mm rockets it found onboard were "identical to those used by Iranian-armed Iraqi insurgents," and that the "large number" of AZ111-A2 fuzes for the munitions were "manufactured solely by the Iranian armament industries [*i.e.*, MODAFL]."[135] Those photos and more were released by the Israeli government and widely publicized by news outlets around the world.[136] *Der Spiegel* quoted Israeli Navy Commander Rani Ben-Yehuda: "What Israeli naval special forces found during the search of the German freighter *Francop* on Wednesday night is enough for a small war. More than 3,000 rockets, plus hand grenades, armor-piercing ammunition, and crates of assault rifle cartridges.

[135] Israeli Ministry of Foreign Affairs, Documented proof of Iranian complicity in arms smuggling to terrorists, Nov. 10, 2009.

[136] *See, e.g.*, *Israel: Photos Prove Iran Link to Arms Ship*, NBC News, Nov. 11, 2009.

Had the dangerous cargo not been discovered, the Lebanese Shiite militia Hezbollah could have waged war on Israel for a month or longer."[137] And after the *Francop* seizure, Prime Minister Netanyahu said the weapons' "sole objective … was to attack and kill as many civilians—women, children and the elderly—as possible."[138]











144. As France's representative to the United Nations explained on December 10, 2009, "*Monchegorsk*, *ANL Australia*, *Hansa India* and now *Francop*. These ships represent a true flow of arms and other dangerous material that is designed to destabilize fragile regions and to perpetuate conflicts," but these "regular shipments originating in the port of Bandar Abbas

---

[137] Matthias Gebauer & Ulrike Putz, *Israel halts Iran-Hezbollah Shipment – 36 containers for the war*, Der Spiegel, Nov. 5, 2009, *translated by Google*.

[138] *PM: UN should discuss Iran 'war crime,'* Jerusalem Post, Nov. 5, 2009.

probably represent only the tip of the iceberg." That assessment was correct. Myriad other instances of IRISL smuggling were identified in classified cables released by *Wikileaks*. During the period 2003 to 2006, the U.S. government observed IRISL ships diverting or attempting to divert from their originally scheduled port calls, in response to perceived threats of interdiction.[139] And in just 2007 and 2008, the U.S. government catalogued an enormous number of IRISL shipments believed to contain weapons or their components.[140] For example:

a. An IRISL vessel in early 2007 loaded 56 containers containing fuzes and ammunition (7.62 mm) in Dalian, China for delivery to Bandar Abbas, Iran.

b. An IRISL vessel in mid-2007 was attempting to ship electronic parts and machine tools used to manufacture weapons.

c. An IRISL vessel in mid-2007 was carrying electronic parts and lathes used to manufacture weapons.

d. An IRISL vessel in mid-2007 was carrying aluminum sheets and plates used to manufacture weapons, intended for Iran and associated with a MODAFL subsidiary.

---

[139] U.S. Dep't of State, Cable, Information for UK Designation of IRISL (July 6, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE69684_a.html.

[140] *Id.*; U.S. Dep't of State, Cable, Multiple Shipments of Sodium Perchlorate from China to Iran (May 18, 2007), *available at* https://wikileaks.org/plusd/cables/07STATE68969_a.html; U.S. Dep't of State, Cable, Shipment of Sodium Perchlorate, Ammunition, and Fuzes from China to Iran (April 14, 2007), *available at* https://wikileaks.org/plusd/cables/07STATE49749_a.html; U.S. Dep't of State, Cable, M/V Gant Star: GOS Provides Storage Cost Estimate (May 24, 2007), *available at* https://wikileaks.org/plusd/cables/07SINGAPORE1003_a.html; U.S. Dep't of State, Cable, Demarche on Impending Conventional Arms Transfer and Interim Follow Up on Ongoing Issues of Proliferation Concern (Nov. 22, 2007), *available at* https://wikileaks.org/plusd/cables/07STATE159388_a.html; U.S. Dep't of State, Cable, Information on Shipment of Proliferation Concern Held in Dubai (Mar. 18, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE27996_a.html; U.S. Dep't of State, Cable, Shield S05-08: Imminent Transfer of CW Precursor Chemical to Iran (April 7, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE35977_a.html; U.S. Dep't of State, Cable, M/V Anne E Shipment of Anhydrous Hydrogen Fluoride from Thailand to Iran (April 23, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE42958_a.html; U.S. Dep't of State, Cable, Shipment of Chinese Origin Goods Destined for Iran (Sep. 2, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE93558_a.html; U.S. Dep't of State, Cable, Shipment of Japanese-Origin Chemical Used in Missile Propellant Bound for Iran (April 28, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE42999_a.html.

e. An IRISL vessel in mid-2007 was en route from Dalian, China, to Bandar Abbas, Iran, carrying cargo for a MODAFL subsidiary used to produce solid fuel for rockets.

f. An IRISL vessel in mid-2007 loaded weapons-related cargo supplied by a MODAFL subsidiary for Syria.

g. An IRISL vessel in late 2007 was carrying potassium perchlorate, a propellant for artillery rockets, destined for a MODAFL subsidiary.

h. IRISL arranged for numerous shipments in 2007 from China to a MODAFL subsidiary in Iran of hundreds of metric tons of sodium perchlorate, used to produce solid-fuel motors for rockets. At least 400 metric tons of sodium perchlorate were confirmed to have arrived in Iran, while another 400 metric tons in 20 containers were seized in Singapore.

i. An IRISL vessel in late 2007 was carrying a variety of weapons-related goods from China to Iran that were consigned to a known MODAFL front company.

j. An IRISL vessel in late 2007 loaded weapons-related cargo supplied by a MODAFL subsidiary for Syria.

k. An IRISL vessel in late 2007 was scheduled to load nearly 200 containers believed to contain "military cargo" in Tianjin, China before sailing to Bandar Abbas, Iran to deliver them to a MODAFL subsidiary.

l. In late 2007, the U.S. government observed IRISL change the policy of one of its shipping lines to avoid refueling while en route to Iran, thus preventing the possibility of inspection and seizure of sensitive cargo.

m. An IRISL vessel in early 2008 was en route from Dalian, China, to Bandar Khomeini, Iran, carrying materials used to produce solid fuel for rockets.

n. An IRISL vessel in early 2008 loaded a "very large shipment" of Chinese-origin anhydrous hydrogen fluoride, used to produce liquid rocket propellants and to refine uranium, in Laem Chabang, Thailand for delivery to Bandar Abbas, Iran.

o. An IRISL vessel in mid-2008 carried from Dalian, China to Bandar Abbas, Iran 13 containers loaded with 208 metric tons of chemical precursors. The shipment, which was consigned to a MODAFL subsidiary, contained potassium perchlorate, a propellant for artillery rockets, as well as liquid poly butadiene, which is used to produce solid rocket propellant. On the same voyage, in Tianjin, China, the IRISL vessel loaded an industrial, two-stage centrifuge with a capacity of 20 tons per hour, useful in rocket manufacturing.

p. An IRISL vessel in mid-2008 was scheduled to ship 1000 metric tons of sodium sulfide, used in the production of chemical weapons, from Tianjin, China to Bandar Abbas, Iran.

q. An IRISL vessel in mid-2009 was scheduled to load 210 metric tons of toluene diisocyanate, used to produce solid rocket propellant, in South Korea for shipment to Bandar Abbas, Iran.

145. The ultimate beneficiaries of these shipments were Iran's terrorist proxies. As the U.S. government highlighted in a State cable, it was "extremely concerned" in 2007 that material transferred from China to Iran by IRISL was "being retransferred by Iran to terrorists, insurgents, and other sub-state groups, where it is being used against U.S. and coalition forces" in Iraq.[141] The U.S. was "continu[ing] to see transfers of military items" and had "specific information that Chinese weapons and components for weapons transferred to Iran are being used against U.S. and Coalition Forces in Iraq, which is a grave U.S. concern."[142] Numerous shipments almost certainly arrived undetected. As the U.S. government lamented, the *Monchegorsk* shipment to Hizballah "would likely not have been identified if not for the boarding of the ship and inspection of its cargo and documents."[143]

**E. IRISL's Continued Operations Were Vital to the Supply of Weapons to Terrorists in Iraq.**

146. With HypoVereinsbank keeping IRISL's maritime smuggling network operating, Iran's weapons flowed in large quantities to its terrorist proxies in Iraq. HypoVereinsbank's

---

[141] U.S. Dep't of State, Cable, Demarche on Impending Conventional Arms Transfer and Interim Follow Up on Ongoing Issues of Proliferation Concern (Nov. 22, 2007), *available at* https://wikileaks.org/plusd/cables/08STATE93558_a.html.

[142] *Id.*

[143] U.S. Dep't of State, Cable, Iranian Shipping in a Post-UNSCR 1803 Environment (Oct. 2, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE102919_a.html; U.S. Dep't of State, Cable, Shipment of Chinese Origin Goods Destined for Iran (Sept. 2, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE93558_a.html.

efforts on behalf of IRISL empowered the Axis of Resistance at a crucial moment when Hizballah was carrying out Imad Mugniyeh's plan (*supra* at 41) to use Iran-supplied rockets, artillery, IEDs, and other weapons to shift the balance of power against the United States. Between 2005 and 2011, as HypoVereinsbank was keeping IRISL's arms shipments flowing amid increasing warnings and sanctions, those shipments were supplying the terrorists in Iraq with an unprecedented arsenal of deadly new weapons, which they stockpiled and used against Americans.

147. As an intelligence analyst summarized, the IRGC and Hizballah "open[ed] the floodgates" during the 2006-2011 time period to provide weapons to JAM terrorists.[144] As another scholar summarized in 2007, "Iran has provided its Iraqi proxies with advanced weapons, including light and heavy mortars, 107-mm and 240-mm rockets, advanced large-caliber sniper rifles, and explosively-formed penetrators (EFPs), capable of penetrating tank armor."[145] Iran's role in supplying these weapons was underscored in December 2006, when U.S. forces in Iraq detained two senior Iranian operatives. According to a *Washington Post* report, "the captured Iranians had detailed weapons lists" and "documents pertaining to shipments of weapons into Iraq."[146]

148. By mid-2007, U.S. military officials reported that the IRGC was regularly supplying between $750,000 and $3 million worth of weapons and funding to Iraqi terrorists

---

[144] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC Sentinel, Nov. 2010.

[145] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[146] Sudarsan Raghavan & Robin Wright, *Iraq Expels 2 Iranians Detained by U.S.; American Defense Official Calls Release 'Obviously Troubling*, The Washington Post, Dec. 30, 2006.

*every month*.[147] This continued for the next several years, with "Vice President Joe Biden estimat[ing]" in 2010 that "Iran spent $100 million to strengthen its Iraqi proxies."[148] As a JAM commander told journalists in June 2007, "All of the Mahdi Army's weapons except for the AK-47 rifles come from Iran."[149] And as one military official put it in August 2007, JAM (including its Special Groups) "would be unable to conduct their terrorist attacks in Iraq without Iranian-supplied weapons."[150]

149. Certain weapons Iran supplied to its Iraqi proxies during this period proved especially deadly.

150. **IEDs**. Americans in Iraq were often targeted with roadside improvised explosive devices (IEDs). These were most effective when made with military-grade high explosives such as C4 or TNT and sophisticated triggering systems, all of which Iran supplied. As Army Maj. Gen. Richard Zahner, the deputy chief of staff for intelligence with Multinational Force Iraq, confirmed in 2006, "The Iranian government is behind shipping components used to make improvised explosive devices to Iraqi insurgents."[151]

---

[147] Marisa Cochrane, *Iraq Report 12: The Fragmentation of the Sadrist Movement*, Iraq Report, Institute for the Study of War, Jan. 2009.

[148] Michael Eisenstadt, et al., *The Regional Impact of Additional Iranian Money*, Washington Institute for Near East Policy, July 28, 2015.

[149] Leila Fadel, *Chilling Stories from the Mahdi Army*, McClatchy DC, June 22, 2007.

[150] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[151] *See* U.S. Dep't of Defense, Iranian Government Behind Shipping Weapons to Iraq, American Forces Information Service (Sep. 28, 2006).

151. One particularly deadly type of IED was the explosively formed penetrator (EFP), a weapon designed to "convert[] the chemical energy of an explosive filler into kinetic energy by propelling a metal liner at high-velocity."[152] As shown in the following diagram, an EFP consists of an explosive charge and a concave copper or steel disk, which upon detonation becomes a molten slug of metal capable of piercing heavily armored vehicles.




152. Scholar Michael Knights described the EFP as "a signature weapon for Iranian-backed groups" in Iraq. This "new breed of roadside bomb" was "more lethal than any seen before."[153] According to *The New York Times*, "Iran passed E.F.P. technology to the Lebanese militia Hezbollah, which in turn passed E.F.P. kits to proxy groups fighting in Iraq."[154] As one JAM member told an interviewer, "We learned [from Hizballah] how to take advantage of an

---

[152] *A History Of Iranian Weapons Shipments To Iraq, Interview With Arkenstone Blog's Galen Wright*, Musings on Iraq, Aug. 9, 2012.

[153] Michael Ware, *Inside Iran's Secret War for Iraq*, Time, Aug. 22, 2005.

[154] John Ismay, *The Most Lethal Weapon Americans Faced in Iraq*, N.Y. Times, Oct. 18, 2013.

armored vehicle's weakness"—referring to the use of EFPs—"and how to wait and kill the soldiers who try to escape."[155]

153. According to a 2007 analysis, the number of EFPs used against Coalition and Iraqi forces rose "at a rate of 150 percent" in 2006.[156] And in the first half of 2007, "Shi'a militants increased their attacks . . . , conducting 65 explosively formed penetrator (EFP) attacks against coalition troops in April alone"[157] and eventually rising to 99 attacks in July 2007.[158] Although EFPs were first used in Iraq as early as 2004, the rapid acceleration of EFP attacks between 2006 and 2008 was likely due to the increasing flow of these weapons and their components from Iran during that period. And while the number of EFP attacks "peaked in 2008,"[159] the EFP continued to be a deadly and popular weapon deployed by JAM against U.S. forces through 2011.[160]

154. U.S. military officials determined that most or all EFPs during the 2006-2008 period were "produced in Iran and smuggled into Iraq."[161] As the U.S. Army noted in detailed presentations, EFPs needed to be produced in Iran because they were "made from special copper

---

[155] Nizar Latif & Phil Sands, *Mehdi Fighters 'Trained by Hizbollah in Lebanon'*, Independent, Aug. 20, 2007.

[156] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[157] Col. Joel D. Rayburn & Col. Frank K. Sobchak, *The U.S. Army in the Iraq War: Volume 2 – Surge and Withdrawal 2007-2011* (US Army War College Press 2019).

[158] *Id.*; Michael O'Hanlon & Jason Campbell, *Iraq Index*, Brookings Institution, Mar. 31, 2008, at 29.

[159] Alex Horton, *Soleimani's legacy: The gruesome, advanced IEDs that haunted U.S. troops in Iraq*, The Washington Post, Jan. 3, 2020.

[160] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC Sentinel, Nov. 2010.

[161] Charles Crain, *How Much is Iran to Blame for Iraq?*, Time, Feb. 12, 2007; *see also* Clay Wilson, *Improvised Explosive Devices (IEDs) in Iraq and Afghanistan: Effects and Countermeasures*, CRS Report for Congress, Aug. 2007.

disks manufactured with highly-calibrated machine tools," and "[m]any of the EFPs found in Iraq ha[d] the markings that indicate[d] that they were manufactured in Iran as recently as 2006."[162] Indeed, "one FBI agent charged with determining the origin of arms caches found that the thousands of [EFP] liners examined were being produced from a relatively small number of individual dies" and "none of these dies had ever been located in Iraq."[163] "Iranian-made C4, identifiable through chemical analysis," was also often used as the explosive charge in EFPs.[164]

155. **Rockets, Mortars, and RPGs**. The range, accuracy, and effectiveness of the rockets, mortars, and rocket propelled grenades (RPGs) Iran supplied to its Iraqi proxies during the 2005-2011 period made them unusually deadly. With powerful engines manufactured in Iran using precursors sourced from Asia, the Iran-supplied rockets could travel up to 30 miles, according to U.S. officials in 2007, making them more difficult for the Americans to stop.[165] For example, three of the rockets targeted U.S. facilities in Baghdad's Green Zone around that time, with one coming very close to hitting the U.S. Embassy, according to U.S. officials.[166] Iran-supplied components made these indirect fire attacks more deadly.

156. By 2010, a scholar estimated that U.S. bases in Iraq were suffering approximately 20-30 rocket attacks each month, "almost all of which involve[d] entire rocket/mortar systems or components (such as fuel packs) identified as Iranian-produced by U.S. weapons intelligence

---

[162] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[163] *A History Of Iranian Weapons Shipments To Iraq, Interview With Arkenstone Blog's Galen Wright*, Musings on Iraq, Aug. 9, 2012.

[164] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC Sentinel, Nov. 2010.

[165] Robin Wright, *Iranian Flow Of Weapons Increasing, Officials Say*, Washington Post, June 3, 2007.

[166] *Id*.

specialists."[167] As one U.S. military official put it in June 2007, "much of the indirect fire that we receive . . . is, in fact, Iranian," and "when we check the tail fins of the mortars, when we find the rockets—and frequently we're able to find them preemptively before they actually launch—there's no doubt that they're coming out of Iran."[168] He added, "Most of them are made fairly recently, in the past several years, and they have lot numbers that we can . . . trace" to Iran.[169] Indeed, the Long War Journal reported that the rockets JAM fired into Baghdad's Green Zone were "the same rockets Hezbollah fired into northern Israel from Lebanon during the Israel-Hezbollah war in the summer of 2006."[170] As for the mortar attacks, a scholar noted in 2010 that "[i]n Baghdad and other cities, [JAM] Special Groups tend to make greater use of 60mm and 81mm mortars to precisely target small U.S. Joint Security Stations."[171] According to the U.S. military, these mortars were Iranian in origin.[172] The 81 mm mortar is uniquely Iranian because the remainder of the region uses 82 mm mortars.[173]

157. **7.62 mm Armor-Piercing Ammunition**. Sniper and small arms attacks also became a persistent problem for Americans in Iraq during the 2005-2011 time period. As the *Los Angeles Times* reported, "By the fall [of 2006], sniper attacks had become so frequent, U.S. military officials said, that U.S. Secret Service agents flew to Baghdad to help establish new

---

[167] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC Sentinel, Nov. 2010.

[168] *Friday, June 29*, CNN, June 30, 2007.

[169] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[170] Bill Roggio, *Mahdi Rocket Teams Destroyed in Sadr City*, Long War J., June 3, 2007.

[171] Michael Knights, *The Evolution of Iran's Special Groups in Iraq*, CTC Sentinel, Nov. 2010.

[172] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[173] *Id.*; Robin Wright, *U.S. vs. Iran: Cold War, Too*, The Washington Post, July 29, 2007.

countermeasures and training."[174] Sniper attacks were growing more frequent because they had become more effective. According to a 2004 report by the National Ground Intelligence Center, Iraq saw a "rise of sniper systems, specifically of the 7.62x54R-mm caliber," employed by Iran's terrorist proxies.[175] The report noted that this development had a "significant" impact on increasing the lethality of attacks on U.S. forces by these groups.[176] Americans in Iraq also saw a rise of armor-piercing 7.62 mm bullets fired from sniper rifles and other small arms. As a 2007 report from Iraq explained, those "armour-piercing rounds pose a deadly threat to US troops on patrol."[177] According to an American soldier, they will "rip through us like we don't even exist."[178]

158. The source of these sniper rifles and armor-piercing ammunition was Iran. As the *Washington Post* explained in 2006, "U.S. military officials have long said they believed Iran was responsible for sending . . . advanced sniper rifles . . . into Iraq to help insurgents and militia groups."[179] In the late 2000s, the U.S. military reported seizure after seizure of Hizballah and

---

[174] Solomon Moore & Tony Perry, *The Conflict in Iraq: 3,000 U.S. Military Deaths; U.S. Military Deaths in Iraq Hit 3,000 Mark*, Los Angeles Times, Jan. 1, 2007.

[175] National Ground Intelligence Center, Iraq Small Arms Handbook (Oct. 1, 2004).

[176] *Id.*

[177] Dave Clark, *Small Victories Make Big Difference in Baghdad Market*, Agence France Presse (English), March 21, 2007.

[178] Ben Murray, *Troops in Iraq Fill Their Days with Hunt for Insurgents*, Stars and Stripes, November 4, 2006.

[179] Sudarsan Raghavan & Robin Wright, *Iraq Expels 2 Iranians Detained by U.S.; American Defense Official Calls Release 'Obviously Troubling*,' The Washington Post, Dec. 30, 2006; *see also, e.g.*, Michael R. Gordon & Andrew W. Lehren, *Leaked Reports Detail Iran's Aid for Iraqi Militias*, N.Y. Times, Oct. 23, 2010 (summarizing leaked military field reports that "recount[ed] Iran's role in providing Iraqi militia fighters with . . . weapons").

JAM weapons caches in Iraq that included many Iran-supplied sniper rifles and thousands of rounds of armor-piercing 7.62 mm ammunition.[180]

159. In sum, as State succinctly explained in its 2008 *Country Reports on Terrorism*, Iran was "continu[ing] to provide . . . weapons . . . to Iraqi militant groups that targeted Coalition and Iraqi forces," including "Iranian-produced advanced rockets, sniper rifles, automatic weapons, and mortars that have killed Iraqi and Coalition Forces," as well as "sophisticated IED technology" such as EFPs "that were specially designed to defeat armored vehicles."[181] And as the U.S. government underscored in a 2008 diplomatic cable, Iran's terrorist proxies "depend[ed] on the ability to bring resources into Iraq for their success."[182]

160. IRISL's continued operations through 2011 were vital to the supply of mass quantities of those deadly weapons that were being used against Americans with alarming frequency in Iraq. As noted above (*supra* at 36), one key route for IRISL shipments was through the Iraqi port of Umm Qasr. Smuggling into Iraq's busiest port under the cover of ordinary shipments enabled large quantities of weapons to be delivered in bulk, while avoiding more heavily monitored land routes from Iran. As the United States assessed in a January 2009 State cable published by *Wikileaks*, the flow of commercial goods into Iraq, particularly at the Umm Qasr port, created "smuggling opportunities for lethal aid, including military hardware" and

---

[180] *See, e.g.*, *Iraqi, U.S. Forces Continue Hunting for Weapons*, U.S. Fed News, Nov. 29, 2005; *U.S. Troops Kill Terrorists in Iraq, IEDs Claim Two Soldiers*, American Forces Press Service, July 15, 2006.

[181] U.S. Dep't, of State, Country Reports on Terrorism (2008).

[182] U.S. Dep't of State, Cable, Improving Iraqi Border Security: A Work in Progress (July 11, 2008), *available at* https://wikileaks.org/plusd/cables/08BAGHDAD2163_a.html.

"ammunition."[183] IRISL shipments—including Iranian weapons for its proxies—were a major part of that flow. When a *Washington Post* reporter visited the Umm Qasr port in 2006, he observed that many of the shipping containers stacked around the port bore the IRISL logo.[184] And when he inquired about the containers with a U.S. official who oversaw the shipment into the port of American goods for the Army Corps of Engineers, he was told, "God knows what they're bringing in here."[185]




161. Moreover, as of July 2008, according to another State cable, "Iraq's most important port" at Umm Qasr had been "assessed to be thoroughly infiltrated by criminal gangs

[183] U.S. Dep't of State, Cable, Major General Aziz Confident about Security but Acknowledges Some Violence Possible (Jan. 25, 2009), *available at* https://wikileaks.org/plusd/cables/09BASRAH2_a.html.

[184] Nelson Hernandez, *For Water Truck 103, a Perilous Path to the End*, Wash. Post, May 16, 2006.

[185] *Id.*

associated with JAM."[186] Indeed, Treasury later designated 20 Iran- and Iraq-based companies and individuals for providing support to Hizballah (through the IRGC-QF) in transferring lethal aid to JAM terrorists by "smuggling through the Iraqi port of Umm Qasr." Treasury emphasized that the "IRGC-QF leveraged Shiite militia group contacts to evade Iraqi government inspection protocol at Umm Qasr port."[187]

162. IRISL's shipments to Iraq were similar to those discovered on the *Francop* in 2009 (*supra* at 67-69). Indeed, the weapons found in IRISL containers on the *Francop* were virtually identical to Iranian weapons found in large JAM weapons caches seized in Iraq during the same period. For example, the 107 mm rockets seized from IRISL's *Francop* shipment are shown at the top of the image below, and the same weapons found in JAM caches in Iraq are shown beneath it. The markings are nearly identical.







[186] U.S. Dep't of State, Cable, Improving Iraqi Border Security: A Work in Progress (July 11, 2008), *available at* https://wikileaks.org/plusd/cables/08BAGHDAD2163_a.html.

[187] U.S. Treasury Dep't, Treasury Designates Vast Network of IRGC QF Officials and Front Companies in Iraq, Iran (Mar. 26, 2020).

163. The 60 mm mortars found on the *Francop*, shown below in canisters (left), were likewise similar to images of mortars found in Iraq and presented by the U.S. military in April 2007 (right). They bore the same physical design and were marked as containing the same Iran-produced AZ111-A2 fuzes, in addition to similar lot numbering and markings.






164. Similarly, C4 explosives, which were typically used for the main charge in EFPs, were often found alongside other EFP parts in the arms caches seized by the U.S. Army in Iraq during 2006-2008, and senior intelligence officials observed that the labels on C4 seized in Iraq in 2006 were identical to the C4 Iran had supplied and shipped on the *Karine A* (*supra* at 39).[188]

165. So too with 81 mm mortars and canisters. Those found on the *Francop* are shown on the left, with similar mortars recovered by the U.S. military in Iraq in 2006, 2007, and thereafter shown on the right. The canisters have the same black cardboard construction, fuze designation, and lot numbering convention, and the mortars have the same fuze designation, design, and ribbing.

[188] Jim Garamone, *Iranian Government Behind Shipping Weapons to Iraq*, American Forces Information Service, Sep. 28, 2006.







166. Shipping to Umm Qasr, however, was only one of several ways that IRISL maintained the flow of deadly weapons into Iraq. Another was by shipping key weapons and components in bulk from Asia to Iran before they were smuggled to Iraq. As the U.S. government assessed in 2009, Iran's weapons programs "remained reliant on outside sources for a variety of materials."[189] Even where some materials were available domestically, "Tehran has continued to acquire such goods abroad" because it "does not trust the quality of indigenously produced goods."[190] For example, Iran's domestic production of solid rocket engines—essential in the artillery it produced—was heavily dependent on precursor chemicals such as sodium

---

[189] U.S. Dep't of State, Cable, Missile Technology Control Regime (MTCR): Iran's Ballistic Missile Program (Sep. 23, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE 98727_a.html.

[190] *Id.*

perchlorate and potassium perchlorate that Iran shipped from China.[191] Iran's weapons programs also required sophisticated machine tools, including precision aluminum milling machines to make Iran's rocket fuzes (shown left from the *Francop*) and dewatering and extruding machines to make "extruded double-base propellants" for Iran's rockets and artillery (rocket propellant shown right from the catalog of Iran's Defense Industries Organization).






167. Those precursor chemicals and machines were shipped to Iran by IRISL, where they were turned into finished weapons that were supplied to Iran's terrorist proxies in Iraq. As the many cases described above demonstrate, IRISL regularly shipped precursor chemicals from China to Iran. *Supra* at 70-72. Another incident demonstrated IRISL's role in procuring machines for weapons production. In May 2007, the U.S. government urged the UAE to search containers on an IRISL ship, the *M/V Iran Kerman*, which revealed "11 tools/machines related to aluminum cutting."[192] Diplomatic cables published by *Wikileaks* show numerous other

---

[191] *See also, e.g.*, U.S. Dep't of State, Cable, Request to Investigate Shipment Destined for Iran's DIO (July 3, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE72026_a.html (Iran seeking to ship 18 metric tons of diphenylamine, commonly used as a stabilizer in explosives and propellants).

[192] U.S. Dep't of State, Cable, IRAN KERMAN—UAE Releases One Container, Holds the Other (May 31, 2007), *available at* https://wikileaks.org/plusd/cables/07ABUDHABI906_a.html.

procurement efforts from Europe and Asia, which likely would have been shipped to Iran by IRISL.[193]

168. In addition, IRISL imported fully manufactured weapons and components from China, which Iran distributed to its terrorist proxies in Iraq. These included armor-piercing 7.62 mm ammunition like those shown below found on the *Francop* in tins with Chinese lettering. In a 2007 diplomatic cable, the U.S. government warned that a Chinese company had "shipped a large quantity of 7.62x39 mm armor piercing ammunition to Iran" multiple times aboard IRISL ships.[194]

---

[193] *See, e.g.*, U.S. Dep't of State, Cable, Iran's Solid-Fueled Ballistic Missile Program Seeking German Equipment via Chinese Entities (Nov. 4, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE113696_a.html ("co-rotating twin screw extender" and "metering gear pumps" from China useful in an "extrusion production line" for solid rocket propellant); U.S. Dep't of State, Cable, Italian Machine Tools Sold to Iranian Clients via Turkish Based Distributor (May 23, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE55497_a.html (five-axis CNC processing machines from Italy "designed to work with advanced materials such as aluminum"); U.S. Dep't of State, Cable, Iranian Firm Seeking Computer Numerical Controller for Use with Filament Winding Machine (Jan. 9, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE2430_a.html (CNC system from Germany for use with a six-axis filament winding machine for producing "rocket motor cases") U.S. Dep't of State, Cable, Iranian Company's Efforts to Procure a Spanish-Made Milling Machine (July 30, 2008), *available at* https://wikileaks.org/plusd/cables/08STATE81940_a.html (CNC milling machines from Spain, including "5-axis milling machine equipped with a rotary table"); U.S. Dep't of State, Cable, Additional Information Regarding the Turkish Firm Ak Makina's Dealings in Iran (Mar. 24, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE27957_a.html ("a number of highly-capable machine tools" from Turkey) U.S. Dep't of State, Cable, Iran Seeking Machine Tool Assistance from Taiwan's Roundtop (Dec. 3, 2009), *available at* https://wikileaks.org/plusd/cables/09STATE124113_a.html (CNC machine tools from Taiwan).

[194] U.S. Dep't of State, Cable, Demarche Concerning ISNA Sanctions on Chinese Conventional Arms Transfers to Iran (March 7, 2007), *available at* https://search.wikileaks.org/plusd/cables/07STATE28998_a.html.






169. Another 2007 cable documented that another IRISL ship had loaded 56 containers in Dalian, China believed to include "7.62 mm ammunition[] and fuzes."[195]

170. After IRISL vessels shipped this ammunition to Iran, it was supplied to terrorist proxies in Iraq. One analyst reported in 2008, "For over a year, U.S. officials have been complaining to their Chinese counterparts about the shipment of Chinese-made" weapons to "Iraqi insurgents," which occurred "largely via Iran."[196] With its IRISL shipments from China, Iran functioned as the "provider of Chinese weapons to forces killing Americans" in Iraq.[197] "The list of Chinese weapons ending up in hands of Iraqi . . . insurgents include[d] . . . armor-

[195] U.S. Dep't of State, Cable, Shipment of Sodium Perchlorate, Ammunition, and Fuzes from China to Iran (April 14, 2007), *available at* https://wikileaks.org/plusd/cables/07STATE49749_a.html.

[196] Richard D. Fisher, Jr., *China Military: Chinese Arms Cost American Lives*, Far E. Econ. Rev., July 4, 2008.

[197] *Id*.

piercing ammunition,"[198] which was regularly used against Americans in Iraq and found in weapons caches recovered there.[199]

171. The same method was used to supply other Chinese weapons. According to Indo-Pacific security scholar Michael Maza, in addition to "components for roadside bombs" made with chemicals supplied by China and "armor-piercing rounds" manufactured in China, Iran "provid[ed] insurgents and terrorists in Iraq . . . with Chinese-manufactured . . . large-caliber sniper rifles, . . . 107mm rockets, [and] 60mm and 82mm mortars."[200] In diplomatic cables released by *Wikileaks*, the U.S. government documented "concrete examples" of such weapons being shipped by Iran from China for distribution to terrorist proxies in Iraq.[201] The U.S. had "captured a number of new-condition Chinese produced small arms from Shia militants in Iraq . . . found together with newly-produced Iranian military materiel."[202] And the U.S. had "recovered in Iraq since mid-2006 hundreds of newly-produced Iranian PG-7-AT1 rocket-propelled grenades that contain[ed] Chinese-made base detonators manufactured as recently as 2004," which "Iraqi Shia militants repeatedly have fired" at Americans.[203]

---

[198] *Id.*

[199] *See, e.g.*, *U.S. Troops Kill Terrorists in Iraq, IEDs Claim Two Soldiers*, American Forces Press Service, July 15, 2006 (recovery of "200 7.62mm armor-piercing rounds"); *Iraqi, U.S. Forces Kill Three al-Qaida Terrorists*, American Forces Press Service, June 10, 2008 (recovery of "more than 700 7.62 mm armor-piercing rounds").

[200] Michael Mazza, *China-Iran Ties: Assessment and Implications for U.S. Policy*, Critical Threats Project, American Enterprise Institute, April 21, 2011).

[201] U.S. Dep't of State, Cable, Soliciting Allies, Support to Engage China on Proliferation-Related Trade with Iran (Sep. 16, 2008), *available at* https://www.wikileaks.org/plusd/cables/08STATE99000_a.html.

[202] *Id.*

[203] *Id.*

172. By 2008, the U.S military was finding so many new Chinese-made weapons in Iraq that Deputy Secretary of State John Negroponte personally conveyed his concerns to Chinese officials during a visit to Beijing in May 2008.[204] As the U.S. government summarized in an August 2008 cable, "[o]ver the past several years" the U.S. had "made repeated approaches to Beijing at all levels regarding transfers by Chinese entities of weapons-related items to Iran, as well as transshipments of concern via Chinese sea ports."[205] The U.S. was "particularly concerned that Iran ha[d] in turn supplied weapons purchased from China to militants fighting against U.S. and Coalition forces in Iraq."[206] IRISL made this supply of weapons from China to Iraq possible.

## III. With Weapons from IRISL, Hizballah Planned, Authorized, and/or Committed the Terrorist Attacks in Iraq that Injured Plaintiffs.

173. As discussed *supra* at 18-19, immediately after the U.S. entered Iraq in 2003, Hizballah began preparing JAM terrorists to attack Americans there. Those efforts escalated in the years that followed as Hizballah, working closely with JAM, orchestrated a wave of terrorist violence against Americans between 2007 and 2011, including the attacks that injured Plaintiffs.

### A. Hizballah Planned, Authorized, and/or Committed the Attacks with JAM.

174. Hizballah managed the logistics to arm the JAM terrorists with weapons from IRISL shipments, and it trained the terrorists in the use of these weapons. Hizballah operatives

---

[204] P. Parameswaran, *U.S. Warns China over Weapon Links in Iran, Iraq, Afghanistan*, Agence France-Presse (English), May 16, 2008.

[205] U.S. Dep't of State, Cable, Soliciting Allies, Support to Engage China on Proliferation-Related Trade with Iran (Sep. 16, 2008), *available at* https://www.wikileaks.org/plusd/cables/08STATE99000_a.html.

[206] *Id.*

participated on the ground in Iraq—authorizing, planning, and often joining JAM in committing the terrorist attacks that employed those weapons against Americans.

175. In JAM's early days, Hizballah began a wide-ranging public propaganda campaign to authorize and incite Shi'a in Iraq to join JAM's campaign of terrorism against Americans there. Hizballah's message of authorization was effective because JAM fighters regarded Hizballah as a moral and religious authority. Hizballah asserted this authority over JAM fighters by, for example, issuing *fatwas* declaring a religious duty to attack Americans in Iraq. Hizballah also exerted personal authority over Sadr, who openly aligned himself with Hizballah. And Hizballah authorized JAM by training and directing JAM fighters, who swore fealty to Hizballah, to kill Americans in Iraq (*supra* at 19-20).

176. By January 2004, nearly 800 Hizballah agents had been sent to Iraq, where they were deployed to direct JAM's terrorist campaign from key JAM strongholds in Iraq, including Sadr City, Najaf, Safwan, and Basra. Eighteen of these Hizballah operatives were detained on charges of terrorism in February 2005. An October 2006 U.S. intelligence summary (as published by *WikiLeaks*) noted that "300 Hezbollah terrorists from Lebanon have joined with [the] Mahdi Militia in Najaf" after travelling to Iraq on tourist visas.[207] In addition to Hizballah terrorist mastermind Imad Mugniyeh (who continued to personally supervise JAM's campaign of terror until his death in February 2008), Hizballah deployed many of its senior terrorist planners in Iraq, including (1) senior Hizballah field commander Ali Mussa Daqduq al-Musawi, who Treasury found in 2012 was "responsible for numerous attacks against Coalition Forces in

[207] U.S. Dep't of Def., US Iraq Intelligence Summary – Iran – Mahdi Militia – Hezbollah – Harbala (Oct. 10, 2006), *available at* https://wikileaks.org/wiki/US_Iraq_Intelligence_Summary_-_Iran_-_Mahdi_Militia_-_Hezbollah_-Harbala_.

Iraq";[208] (2) Nasrallah's personal liaison to JAM Muhammad Kawtharani, who was "responsible for terrorist operations" in Iraq "[a]s the individual in charge of Hizballah's Iraq activities,"[209] and was directly involved in coordinating attacks against Americans in Baghdad; (3) senior Hizballah commander Yusuf Hashem, who coordinated Hizballah's JAM operations in Iraq;[210] (4) Hizballah member Ali Falih Hadi, who, according to a Coalition threat report (as published by *WikiLeaks*), was based in Amarah in Basra Province and was "responsible for supplying weapons" to members of a joint Jaysh al-Mahdi/Hizballah cell operating in Basra;[211] and (5) on information and belief, one or more experienced Hizballah bombmakers, who provided in-country direction to JAM terrorists. These Hizballah terrorists and many others were dedicated to providing weapons, training, and knowledge to JAM with the intent of harming Americans in Iraq.

177. The Hizballah operatives planned a campaign of escalating terrorist attacks that JAM began to carry out at Hizballah's direction in the winter of 2005. This escalation was the result of Hizballah's "strategic decision" to ratchet up pressure on the United States by boosting Hizballah's "support [for] Sadr" and fostering "managed instability" in Iraq.[212] According to a senior American intelligence official cited in *The New York Times*, Hizballah "train[ed] [JAM

---

[208] U.S. Dep't of Treasury, Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq (Nov. 19, 2012).

[209] U.S. Dep't of Treasury, Treasury Sanctions Hizballah Leadership (Aug. 22, 2013).

[210] Matthew Levitt, *Hezbollah's Regional Activities in Support of Iran's Proxy Networks*, Middle East Institute, July 26, 2021.

[211] U.S. Army, Threat Report: Ambush Threat (Jul. 16, 2008), *available at* https://wikileaks.org/irq/report/2008/07/IRQ20080716n11210.html. While the report identifies "Ali Falih Hadey," on information and belief "Hadey" has the same meaning as "Hadi."

[212] Michel R. Gordon & Dexter Filkins, *Hezbollah Said to Help Shiite Army in Iraq*, N.Y. Times, Nov. 28, 2006.

fighters] inside of Iraq" and sent them to Lebanon for more training by Hizballah.[213] This training was designed to help "Iraqi militants to carry out numerous terrorist attacks" targeting Americans.[214] JAM recruits who had little to no combat experience were taught Hizballah's methods to be used against American forces in Iraq. This included training in how to use the most deadly weapons—including EFPs, rockets, mortars, RPGs, sniper rifles, and small arms with armor-piercing ammunition—that Hizballah was supplying to JAM from Iran.

178. The extent of Hizballah's involvement in JAM's attacks was demonstrated by evidence gathered in connection with the capture of Hizballah commander Daqduq in 2007, which included a document described by five U.S. Senators as a 22-page "planning guide" spelling out how JAM fighters should deploy the training and weaponry Hizballah provided. It included specific instructions describing how to plant IEDs and carry out abductions of Americans. Hizballah's instruction as reflected in this "planning guide" enabled JAM to execute an array of sophisticated attacks against Americans that it otherwise would have been unable to carry out.

179. Hizballah's involvement was also demonstrated by the types of attacks JAM committed. Many of JAM's attacks employed tactics that Hizballah had trained JAM fighters to use. As a declassified British intelligence report concluded, for example, EFPs used in Iraq during the relevant period were "exclusively associated with Hizballah," who was the world's

---

[213] *Id. Accord* U.S. Treasury Dep't, Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq (Nov. 19, 2012) (finding that, in 2005, Iran "asked Hizballah to form a group to train Iraqis to fight Coalition Forces in Iraq," prompting Hizballah to "establish[] a covert Hizballah unit to train and advise Iraqi militants in Jaysh al-Mahdi (JAM) and JAM Special Groups").

[214] U.S. Treasury Dep't, Treasury Designates Hizballah Commander Responsible for American Deaths in Iraq (Nov. 19, 2012).

foremost expert on EFPs.[215] Hizballah planned these EFP attacks by giving assistance to JAM regarding EFP design, helping JAM prepare these weapons, teaching JAM fighters how to use them, identifying specific target locations in Iraq, and sending senior Hezbollah terrorists to coordinate the EFP attacks. Hizballah thus not only provided the EFPs to JAM but also instructed JAM to use them against American soldiers and taught JAM how to do so. As another example, Hizballah directed JAM members to launch indirect-fire rocket attacks and instructed them on how to do so. Hizballah's direction to fire rockets on the Green Zone from Sadr City specifically included the indirect-fire attacks in early 2008 that precipitated the Battle of Sadr City. During these attacks, in 2008, JAM rocket teams showed an ability to hit specific targets several miles away, demonstrating the effectiveness of Hizballah's instruction and the sophistication of the rockets supplied from Iran. The same was true for other types of attacks with tactics that reflected specialized Hizballah training, including sniper, mortar, and RPG attacks, as well as the use of small arms in combination with other weapons.

180. Between 2003 and 2007, Jaysh al-Mahdi expanded from a fledgling group concentrated in Shi'a areas to a terrorist organization with a significant presence throughout Iraq. What began as a small group of 300 fighters in April 2003 grew to a terrorist organization of between 6,000 and 10,000 fighters by June 2004 and boasted at least 60,000 fighters by January 2007. JAM operated throughout Iraq, with regional command centers in Kirkuk, Diyala, Baghdad, Wasit, Hillah, Karbala, Amarah, Basra, Diwaniyah, and Nasiriyah. Jaysh al-Mahdi maintained an especially strong presence in the Al Rashid, Karkh, and Kadamiyah Districts of western Baghdad, all of eastern Baghdad (including the areas in and around Sadr City and

[215] Minute, Deputy Chief of Assessments Staff to Sir Nigel Sheinwald, Iraq: Lebanese Training including manuscript comment Blair (May 3, 2007).

Rustamiyah), Baqubah, Hillah, Najaf, Basra, and Wasit (though its power extended well beyond those areas).

181. With Hizballah supplying weapons from Iran and directing JAM's attacks, JAM terrorists inflicted enormous death and suffering on Americans involved in the reconstruction of Iraq between 2007 and 2011. "Coalition sources report[ed] that by August 2007, Iranian-backed insurgents accounted for roughly half the attacks on Coalition forces, a dramatic change from previous periods,"[216] leading General David Petraeus to conclude that "JAM is more of a hindrance to long-term security in Iraq than is [Al-Qaeda in Iraq]."[217] By 2011, Hizballah Secretary General Nasrallah had declared victory, boasting in a speech that the Hizballah-JAM campaign of terror against Americans in Iraq should be considered a model for terrorist campaigns against the U.S. and its allies around the world.

### B. Plaintiffs Were Injured in the Attacks.

182. The Plaintiffs in this case are 166 individuals who were injured as a result of numerous terrorist attacks in Iraq between 2007 and 2011. Each of the attacks would have violated the laws of war if the terrorists who committed the attack were subject to them because, among other reasons, victims of the attack were civilians not taking part in hostilities and/or terrorist(s) who committed the attack neither wore uniforms nor otherwise identified themselves as enemy combatants, and the attack indiscriminately placed civilians at risk.

183. The weapons used in each attack were the same type of weapons Iran supplied to Hizballah, and through Hizballah, to JAM operatives in Iraq.

---

[216] Kimberly Kagan, *Iran's Proxy War Against the United States and the Iraqi Government*, Iraq Report, Institute for the Study of War and WeeklyStandard.com, Aug. 29, 2007.

[217] Michael R. Gordon & Gen. Bernard E. Trainor, The Endgame: The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama 422 (2012).

184. Plaintiffs are the individuals directly injured in those attacks, the estates of individuals killed in those attacks, and the family members who suffered as a result of the harm to their loved ones. The following table identifies each direct victim and their corresponding attack(s).

185. For each attack, the table identifies the date and location of the attack, the terrorist group that committed the attack, and the types of weapons used in the attack. Attacks identified as "Hizballah JC" were committed by Hizballah-JAM Joint Cells. For each of these attacks, the attack was planned, authorized, and committed by Hizballah, along with JAM, as part of a joint cell consisting of Hizballah and JAM operatives working together to carry out the attack. These Joint Cells operated from key regions where Hizballah was present in Iraq, including Baghdad Province, Basra Province, Diyala Province, and Babil Province. Attacks identified as "JAM" were committed by JAM but were planned and authorized by Hizballah. *See supra* at 89-94.

186. The table below identifies the individuals directly injured in each attack, most of whom are Plaintiffs. Each direct-victim Plaintiff was severely injured in his or her person and/or property as a result of the corresponding attack. Those injuries include, but are not limited to, the injuries identified in the table below. In addition, each direct-victim Plaintiff experienced severe physical and emotional pain and suffering as a result of the attack and their injuries.

187. The table below includes additional Plaintiffs who are either estates or family members of direct victims. For each family-member Plaintiff, the table identifies their relation to the direct victim. Each of these family-member Plaintiffs experienced severe mental anguish and emotional pain and suffering as a result of the attack and the injuries to their loved one. For each family-member Plaintiff who was not a spouse, or a biological parent, sibling, or child of the direct victim, the Plaintiff lived in the same household as the direct victim for a substantial

period of time and considered the direct victim the functional equivalent of a biological parent or child.

188. Each Plaintiff was a U.S. national at the time of the attack and remains one today.

| Attack | Terrorist | Weapon | Direct Victim | Plaintiff | Injury/Relation |
|---|---|---|---|---|---|
| Multiple attacks: 2007 - Spring 2008; Spring 2008 - Spring 2009 Saladin Governorate | Hizballah JC | Rocket, IED, Sniper | Specialist James Connolly | Specialist James Connolly | PTSD |
| Multiple attacks: 8/07 - 11/08; 3/27/08 Baghdad Governorate | Hizballah JC | IED, EFP, sniper | Staff Sergeant David Manganella | Staff Sergeant David Manganella | Injury to the spine, concussion, TBI, memory, sleep, and speech impairment, back damage to the L4/5 nerve, sciatica, substance abuse, and PTSD |
| Multiple attacks: 8/14/07; 2/7/08 Baghdad Governorate | Hizballah JC | EFP, IED, RPG, mortar | Sergeant Dustin Bauer | Sergeant Dustin Bauer | TBI, lower back injury (fused vertebrae), knee and hip pain |
| | | | | Kiya Bauer | Daughter |
| | | | | Sophia Bauer | Daughter |
| Multiple Attacks: 9/07 - 10/08 Baghdad Governorate | JAM | EFP, IED, rocket/mortar | Sergeant Christopher Landry | Sergeant Christopher Landry | TBI, back injuries, multiple stress fractures, severe hearing loss |
| Multiple attacks: 9/07 - 10/08 Baghdad Governorate | JAM | EFP | Corporal Shawn Donnery | Corporal Shawn Donnery | TBI, degenerative disc disease, PTSD |

| | | | | | |
|---|---|---|---|---|---|
| Multiple Attacks: 11/07 - 2/09 Baghdad Governorate | JAM | EFP, mortar, rocket | Sergeant Jarrod Lagrone | Sergeant Jarrod Lagrone | Permanent hearing loss, TBI, PTSD |
| Multiple Attacks: 12/07 - 3/09 Baghdad Governorate | JAM | EFP, RPG | Specialist Christopher Halski | Specialist Christopher Halski | Permanent hearing loss, leg injury |
| 1/18/08 Baghdad Governorate | JAM | EFP | Specialist Nicholas Anna | Specialist Nicholas Anna | Knee injury, PTSD |
| | | | Specialist Timothy DuVall Jr. | Specialist Timothy DuVall Jr. | Concussion, headaches, tinnitus, PTSD |
| 9/30/08 Baghdad Governorate | Hizballah JC | Small arms | Specialist Christopher Bartkiewicz, who died as a result of the attack | Emily Stevenson | Widow |
| 10/15/08 Mansour District, Ghazaliya | Hizballah JC | RPG | Sergeant Thomas Henshall Jr. | Sergeant Thomas Henshall Jr. | Joint, spine, and back injuries, TBI, concussion, tinnitus, burns, PTSD, depression and anxiety |
| 10/15/08 Babil Governorate | JAM | IED | Specialist Mark Whetzel | Specialist Mark Whetzel | Dislocated shoulder, ankle pain, TBI, headaches, memory loss, PTSD |
| | | | | Jennifer Whetzel | Wife |
| | | | | Dianna Whetzel | Daughter |

| | | | | | |
|---|---|---|---|---|---|
| 10/16/08 Diyala Governorate | Hizballah JC | Rockets, IRAM | Specialist Brian Fifer | Specialist Brian Fifer | Broken bones, spine and back injury, TBI, concussion, vision loss |
| | | | | Kelli Fifer | Sister |
| 10/16/08 Diyala Governorate | Hizballah JC | Rockets, IRAM | Private First Class Robert Mason | Private First Class Robert Mason | Spine and back injuries, tinnitus, PTSD, depression, and anxiety |
| | | | | Rochelle Lang | Sister |
| 10/30/08 Diyala Governorate | Hizballah JC | IED | Specialist Emanuel Alvarez | Specialist Emanuel Alvarez | Spine and back injury, shrapnel to face, optic nerve damage, TBI, concussion, PTSD, anxiety |
| 11/22/08 Babil Governorate | JAM | EFP | Specialist Michael Owen | Specialist Michael Owen | Multiple shrapnel wounds to thigh, femoral artery injury, shatteredand fractured fingers, TBI, migraines, headaches, anxiety, depression, social anxiety disorder, PTSD, and social and occupational impairment |
| | | | | Riley Owen | Daughter |
| | | | | Laurie Miller | Mother |
| | | | Sergeant Sean Williams | Sergeant Sean Williams | TBI, concussion, hearing loss, tinnitus, PTSD, depression, anxiety |

| | | | | | |
|---|---|---|---|---|---|
| 12/31/08 Baghdad Governorate | Hizballah JC | Rockets, mortars | Private First Class Benjamin Tollefson, who died as a result of the attack | Mary Tollefson | Widow |
| | | | | Jamie Tollefson | Sister |
| | | | | Jeffrey Tollefson | Brother |
| 1/20/09 Nasiriyah | Hizballah JC | Rockets, IRAM | Sergeant David Tanner | Sergeant David Tanner | Head injury, TBI, lower back injury, shoulder injury, hearing loss, herniated disc, tinnitus, PTSD |
| 2/11/09 Adhamiyah District, Baghdad | Hizballah JC | EFP | Private First Class Graham Lindsey | Private First Class Graham Lindsey | TBI, spinal injury, back and neck pain, PTSD, anxiety, nightmares, irritability, sleep disturbances |
| 2/15/09 Basra Governorate | Hizballah JC | EFP | Staff Sergeant Sean D. Diamond, who died as a result of the attack | Estate of Staff Sergeant Sean Diamond | |
| | | | | Loramay Diamond | Widow |
| | | | | Athena Diamond | Daughter |
| | | | | Madison Diamond | Daughter |
| | | | | Sean Diamond | Son |
| | | | | Taylor Diamond | Daughter |
| | | | | Estate of Sally Wiley | Mother |
| | | | | Jason Diamond | Brother |
| | | | | Estate of James Wiley | Stepfather |

| | | | | | |
|---|---|---|---|---|---|
| 12/31/08 Baghdad Governorate | Hizballah JC | Rockets, mortars | Private First Class Benjamin Tollefson, who died as a result of the attack | Mary Tollefson | Widow |
| | | | | Jamie Tollefson | Sister |
| | | | | Jeffrey Tollefson | Brother |
| 1/20/09 Nasiriyah | Hizballah JC | Rockets, IRAM | Sergeant David Tanner | Sergeant David Tanner | Head injury, TBI, lower back injury, shoulder injury, hearing loss, herniated disc, tinnitus, PTSD |
| 2/11/09 Adhamiyah District, Baghdad | Hizballah JC | EFP | Private First Class Graham Lindsey | Private First Class Graham Lindsey | TBI, spinal injury, back and neck pain, PTSD, anxiety, nightmares, irritability, sleep disturbances |
| 2/15/09 Basra Governorate | Hizballah JC | EFP | Staff Sergeant Sean D. Diamond, who died as a result of the attack | Estate of Staff Sergeant Sean Diamond | |
| | | | | Loramay Diamond | Widow |
| | | | | Athena Diamond | Daughter |
| | | | | Madison Diamond | Daughter |
| | | | | Sean Diamond | Son |
| | | | | Taylor Diamond | Daughter |
| | | | | Estate of Sally Wiley | Mother |
| | | | | Jason Diamond | Brother |
| | | | | Estate of James Wiley | Stepfather |

| | | | | | |
|---|---|---|---|---|---|
| | | | Specialist Shawn Durnen | Specialist Shawn Durnen | Joint damage, spine and back injuries, TBI, tinnitus, PTSD, depression, anxiety |
| 2/18/09 Maysan Governorate | Hizballah JC | IED | Staff Sergeant Richard Hedgecock II | Staff Sergeant Richard Hedgecock II | TBI, concussion, abrasions to leg, ankle, and hand, shoulder strain, tinnitus, migraines, PTSD |
| 2/26/09 Baghdad Governorate | Hizballah JC | EFP | Corporal Brian Connelly, who died as a result of the attack | Kara Connelly | Widow |
| | | | | Jean Dammann | Mother |
| | | | | Kevin Connelly | Brother |
| | | | | Mark Dammann | Stepfather |
| 3/1/09 Baghdad Governorate | JAM | Mortar | Sergeant Miguel Gonzalez | Sergeant Miguel Gonzalez | Spinal fracture, back pain, TBI, macular degeneration |
| 4/1/09 Baghdad Governorate | JAM | EFP | Staff Sergeant Mark Fletcher | Staff Sergeant Mark Fletcher | Shrapnel to legs, burns, nerve damage, concussion, tinnitus, depression, anxiety, PTSD |
| 4/12/09 Saladin Governorate | Hizballah JC | EFP | Corporal Michael Anaya, who died as a result of the attack | Estate of Corporal Michael Anaya | |
| | | | | Estate of Cheryl Anaya | Mother |
| | | | | Carmelo Anaya Jr. | Brother |
| | | | | Trista Moffett | Sister |
| 4/13/09 Baghdad Governorate | Hizballah JC | EFP | Sergeant Raul Moncada, who died as a result of the attack | Priscila Moncada | Daughter |
| | | | | Obdulia Moncada | Mother |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Alexandra Aguilar | Sister |
| | | | | Miriam Lopez | Sister |
| | | | | Daniela Moncada | Sister |
| | | | | Matthew Moncada | Brother |
| 5/4/09 Basra Governorate | Hizballah JC | EFP | Sergeant Joseph Santolla | Sergeant Joseph Santolla | TBI, ultricular and superior vestibular nerve dysfunction, peripheral neuropathy with impaired strength in both hands, PTSD, hearing loss with tinnitus |
| | | | | Jeanetta Santolla | Wife |
| | | | | Sarah Santolla | Daughter |
| 5/27/09 Baghdad Governorate | Hizballah JC | IED | Specialist Chad Edmundson, who died as a result of the attack | Karen James | Mother |
| 6/29/09 Baghdad Governorate | Hizballah JC | IED | Sergeant Roger Adams Jr., who died as a result of the attack | Cheryl Larson | Sister |
| | | | | Brandy Loss | Sister |
| 7/23/09 Kirkuk Governorate | Hizballah JC | Grenade | Sergeant First Class Johnny Polk, who died as a result of the attack | Wanonia Polk | Widow |
| | | | | Mary Polk | Sister |
| | | | | Walter Polk | Brother |
| | | | | Alvin Jones III | Stepson |
| | | | | Deandra Jones | Stepson |
| | | | | Xavier Jones | Stepson |

| | | | | | |
|---|---|---|---|---|---|
| 8/21/09 Baghdad Governorate | JAM | EFP | Lieutenant Colonel Randall Klingensmith | Lieutenant Colonel Randall Klingensmith | Fractured lower back, TBI, injuries to shoulder, broken teeth, ruptured ear, shrapnel wounds to leg, partial amputation of leg, hearing loss, muscle loss, PTSD |
| 10/12/09 Maysan Governorate | Hizballah JC | EFP | Sergeant Stephen Evans | Sergeant Stephen Evans | Burns to face and body, tibia wound, loss of one testicle, loss of tissue in thigh, TBI |
| 11/22/09 Wasit Governorate | Hizballah JC | Small arms | Staff Sergeant Briand Williams, who died as a result of the attack | Atyinia Williams | Widow |
| | | | | C.W. | Minor Son |
| 12/16/09 Near Basra | Hizballah JC | EFP | Sergeant Jeffery Evans | Sergeant Jeffery Evans | Spine and back injuries, TBI, PTSD |
| 1/22/10 Basra Governorate | Hizballah JC | Rocket/mortar | Private First Class Robin Honeycutt | Private First Class Robin Honeycutt | Shrapnel wounds to leg, anxiety, depression, PTSD |
| 2/18/10 Baghdad Governorate | Hizballah JC | EFP | Sergeant Jeffery Burton | Sergeant Jeffery Burton | Spine and back injuries, tinnitus, PTSD, depression, anxiety |
| | | | | Jane Burton | Mother |
| | | | | Charles Burton | Father |
| | | | | Patrick Burton | Brother |
| 7/14/10 Baghdad Governorate | Hizballah JC | EFP | Sergeant Jeremy Cashwell | Sergeant Jeremy Cashwell | Joint damage, tinnitus, PTSD, depression, anxiety, |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | addiction |
| 7/20/10 Baghdad Governorate | JAM | EFP | Sergeant Kyle Lloyd | Sergeant Kyle Lloyd | Shrapnel to legs, left distal femur blown off, severed femoral artery, sciatic nerve damage, laceration to hand, leg amputation |
| 8/4/10 Najaf Governorate | Hizballah JC | EFP | Specialist Joshua Craven | Specialist Joshua Craven | Leg amputation, paralysis |
| | | | | Holly Craven | Wife |
| 8/15/10 Diyala Governorate | Hizballah JC | Grenade | Sergeant Jamal Rhett, who died as a result of the attack | Thornell Rhett | Father |
| | | | | Jason Rhett | Brother |
| 9/1/10 Maysan Governorate | Hizballah JC | Rocket, IRAM | Specialist Matthew Whiteside | Specialist Matthew Whiteside | Spine and back injuries, TBI, concussion, hearing loss, tinnitus, PTSD, depression, addiction |
| | | | | Kandi Whiteside | Wife |
| | | | | M.W. | Minor Daughter |
| | | | | Sharon Whiteside | Mother |
| | | | | Mark Whiteside | Father |
| | | | | Christopher Whiteside | Brother |
| | | | | Jackson Whiteside | Brother |
| Multiple attacks: 11/8/10; 1/17/11 Baghdad Governorate | JAM | EFP | Staff Sergeant Olney Johnson | Staff Sergeant Olney Johnson | (1) Upper back injuries, TBI, hearing loss, tinnitus, nerve damage, partial |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | removal of skull, PTSD |
| 2/9/11 Dhi Qar Governorate | Hizballah JC | Rocket/ mortar | Sergeant Sharon Stallworth | Sergeant Sharon Stallworth | Joint damage, spine and back injuries, TBI, tinnitus, PTSD, depression, anxiety |
| 2/16/11 Baghdad | Hizballah JC | EFP | Private Walter Thomas | Private Walter Thomas | PTSD, depression, anxiety |
| 3/28/11 Baghdad | Hizballah JC | Rocket, IRAM | Mr. Sam Kallabat | Mr. Sam Kallabat | |
| | | | | Fadia Kallabat | Wife |
| | | | | Kevin Kallabat | Son |
| | | | | Nicholas Kallabat | Son |
| | | | | Ursula Kallabat | Daughter |
| 4/2/11 Babil Governorate | JAM | Rocket, IRAM | Staff Sergeant Darryl Dotson Jr. | Staff Sergeant Darryl Dotson Jr. | Concussion, PTSD |
| | | | Staff Sergeant Christian Garcia, who died as a result of the attack | Estate of Staff Sergeant Christian Garcia | |
| | | | | Angela Garcia | Wife |
| | | | | K.G. | Minor Son |
| | | | | Klaryssa Garcia | Daughter |
| | | | | Christopher Satterfield | Stepson |
| | | | | Joel Hernandez | Stepson |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Victoria Hernandez | Stepdaughter |
| 4/15/11 Baghdad Governorate | JAM | EFP | Specialist Michael Pasco | Specialist Michael Pasco | TBI, shrapnel wounds, PTSD |
| 4/22/11 Wasit Governorate | Hizballah JC | EFP | First Lieutenant Omar Vazquez, who died as a result of the attack | Estate of First Lieutenant Omar Vazquez | |
| | | | | Maria Vazquez | Mother |
| | | | | Marisel Vazquez | Sister |
| 5/30/11 Dhi Qar Governorate | Hizballah JC | EFP | First Lieutenant Jared Burgess | First Lieutenant Jared Burgess | TBI, headaches, tinnitus, neuropathy in neck, back injury, shoulder injury, PTSD |
| | | | First Lieutenant Thomas Gregory III | First Lieutenant Thomas Gregory III | TBI, ruptured eardrum, PTSD |
| 6/6/11 Baghdad Governorate | JAM | Rockets, IRAM | Specialist Tymon Coleman | Specialist Tymon Coleman | Tinnitus, PTSD, depression, anxiety |
| | | | | Astra Coleman | Wife |
| | | | | T.C. | Minor Son |
| | | | Specialist Christopher Fishbeck, who died as a result of the attack | Estate of Specialist Christopher Fishbeck | |
| | | | | Toni Attanasio | Mother |
| | | | | Gary Fishbeck | Father |
| | | | | Rene Gutel | Sister |
| | | | | Randi Martz | Sister |
| | | | | Ana Gomez | Stepmother |

| | | | | | |
|---|---|---|---|---|---|
| | | | Specialist Robert Hartwick, who died as a result of the attack | Estate of Specialist Robert Hartwick | |
| | | | | Linda Hartwick | Mother |
| | | | | Robert Hartwick | Father |
| | | | | Hannah Hartwick | Sister |
| | | | | Haley Preston | Sister |
| | | | Sergeant Christian Rodriguez | Sergeant Christian Rodriguez | PTSD, depression, anxiety |
| | | | | C.R. | Minor Son |
| 6/15/11 Maysan Governorate | Hizballah JC | Rockets, IRAM | Sergeant Jarrad Davenport | Sergeant Jarrad Davenport | Injuries to shoulder, wrist, spine, and PTSD |
| | | | | LaToya Davenport | Wife |
| | | | | Darrius Davenport | Son |
| | | | | Jarrad E. Davenport | Son |
| | | | | X.D. | Minor Son |
| 6/23/11 Baghdad Governorate | Hizballah JC | EFP | Dr. Stephen Everhart, who died as a result of the attack | Estate of Dr. Stephen Everhart | |
| | | | | Stephanie Zobay | Widow |
| | | | | Hannah Everhart | Daughter |
| | | | | Hayden Everhart | Son |
| | | | | Lindsay Everhart | Daughter |
| | | | Mr. Abdul Mughal | Mr. Abdul Mughal | Broken hand, partial loss of hearing, shrapnel injuries, PTSD |
| | | | | Sitorai Khasanzod | Wife |

| | | | | | |
|---|---|---|---|---|---|
| | | | | Angela Mughal | Daughter |
| | | | | Hamid Mughal | Son |
| | | | | Khalid Mughal | Son |
| | | | | M.M. | Minor Son |
| | | | | Nabila Mughal | Daughter |
| 6/29/11 Wasit Governorate | JAM | Rockets, IRAM | Specialist Joseph Talbert | Estate of Specialist Joseph Talbert | TBI, memory loss, shoulder injury, PTSD, anxiety, depression, and subsequent death as a result of PTSD |
| 7/7/11 Baghdad Governorate | Hizballah JC | EFP | Staff Sergeant Jason Rzepa | Staff Sergeant Jason Rzepa | Amputation of both legs |
| | | | | Cassandra Rzepa | Wife |
| | | | | C.R. | Minor Son |
| | | | | Kohl Rzepa | Son |
| 7/8/11 Baghdad Governorate | Hizballah JC | Rocket/ mortar | Technical Sergeant Tyler Ogden | Technical Sergeant Tyler Ogden | Shrapnel to leg, knee and ankle, muscle damage, hearing loss, PTSD |
| | | | | Sheryl Chen | Mother |
| | | | | Jerrin Ogden | Brother |
| 7/10/11 Maysan Governorate | Hizballah JC | Rocket/ mortar | Staff Sergeant William Chinn | Staff Sergeant William Chinn | Severe injuries requiring extensive treatment |
| | | | First Lieutenant Sean Niquette | First Lieutenant Sean Niquette | TBI |
| | | | | Lauren Niquette | Wife |
| | | | | Mary Niquette | Mother |
| | | | | Thomas Niquette | Father |

| | | | | | |
|---|---|---|---|---|---|
| 10/12/11 Maysan Governorate | Hizballah JC | Rocket/ mortar | Private First Class Brian Alldridge | Private First Class Brian Alldridge | Shrapnel inuries, TBI |
| | | | | Dianna Alldridge | Mother |
| | | | | Ronald Alldridge | Father |
| | | | | Todd Alldridge | Brother |
| | | | | Andrew Major | Stepson |
| 11/2/11 Al Qadisiyah Governorate | Hizballah JC | Grenade | Private First Class Marcus Sullen | Private First Class Marcus Sullen | TBI, memory loss, depression, sleep apnea, anxiety, PTSD |

## CLAIM FOR RELIEF

### Aiding and Abetting Under the Anti-Terrorism Act
### 18 U.S.C. § 2333(d)(2)

189. Plaintiffs incorporate their factual allegations above.

190. To establish a claim for aiding and abetting under JASTA, 18 U.S.C. § 2333(d), Plaintiffs must show: (1) that they are U.S. nationals, or the estates, survivors, or heirs of U.S. nationals; (2) that they were injured by an act of "international terrorism," as defined by 18 U.S.C. § 2331(1); (3) that the act of international terrorism was committed, planned, or authorized by a designated FTO; (4) that HypoVereinsbank was generally aware that it was playing a role in an overall illegal or tortious activity from which the act of international terrorism was a foreseeable consequence; and (5) that HypoVereinsbank knowingly provided substantial assistance.

191. Every Plaintiff is a U.S. national, or the estate, survivor, or heir of a U.S. national.

192. The terrorist attacks that injured Plaintiffs were acts of "international terrorism" because:

a. the attacks involved violent and dangerous acts that violate the criminal laws of the United States and many States (or would if committed in the United States). In particular, each attack constituted one or more of murder, attempted murder, conspiracy to murder, kidnapping, and arson, in violation of state law; and the destruction of U.S. property by fire or explosive, conspiracy to murder in a foreign country, killing and attempted killing of U.S. employees performing official duties, hostage taking, damaging U.S. government property, killing U.S. nationals abroad, use of weapons of mass destruction, commission of acts of terrorism transcending national boundaries, and bombing places of public use,

in violation of 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, and 2332f, respectively;

b. the attacks, carried out by terrorists bent on expelling the United States and its allies from Iraq and the Middle East, appear to have been intended (i) to intimidate or coerce the civilian populations of Iraq, Israel, the United States, and other nations, (ii) to influence the policy of the U.S., Iraqi, Israeli and other governments by intimidation and coercion, and (iii) to affect the conduct of the U.S., Iraqi, Israeli, and other governments by mass destruction, assassination, and kidnapping; and

193. the attacks occurred primarily outside the territorial jurisdiction of the United States, in Iraq.

194. Every attack was committed, planned, or authorized by Hizballah, which was an FTO at all relevant times.

195. HypoVereinsbank was generally aware that it was playing a role in illegal activity. HypoVereinsbank knew at all relevant times that it was helping IRISL evade U.S. counterterrorism controls and international scrutiny by omitting or falsifying information regarding IRISL's transactions, in violation of New York state law, the Bank Secrecy Act, and U.S. banking laws that required the transmittal of accurate business records to U.S. branches and correspondent banks, customer due diligence, and suspicious activity reporting. In many cases when HypoVereinsbank processed IRISL transactions through the U.S. financial system, HypoVereinsbank also violated U.S. sanctions laws. HypoVereinsbank further knew that those laws were in place precisely to deprive IRISL of the secrecy it needed to maintain its systematic shipment of weapons to Iran's terrorist proxies. HypoVereinsbank knew that it was playing a

role in IRISL's weapons smuggling when it helped IRISL hide from international scrutiny and continue the maritime shipping operations that IRISL used as cover to smuggle weapons.

196. HypoVereinsbank knowingly assisted the attacks on Plaintiffs. HypoVereinsbank's conduct was part of a deliberate, years-long scheme to court and protect IRISL, despite HypoVereinsbank's acute knowledge that keeping IRISL in operation would facilitate terrorist attacks in Iraq by supplying the terrorists with weapons.

197. HypoVereinsbank did not merely engage in passive nonfeasance or routine banking transactions. Instead, it actively sought out business from IRISL; provided it with extraordinary, illegal services (including special treatment affording illicit bank secrecy designed to facilitate evasion of counterterrorism controls); all while deceiving law enforcement and counterterrorism authorities about HypoVereinsbank's transactions. At all times, HypoVereinsbank exhibited contempt for U.S. counterterrorism rules and warnings that were intended to protect Americans targeted by Hizballah terrorism, choosing instead to prioritize business with a favored client over the lives of its victims. HypoVereinsbank did all of this with knowledge that it was aiding terrorist organizations carrying out attacks on Americans.

198. HypoVereinsbank's assistance was substantial. HypoVereinsbank's extensive efforts to launder IRISL's transactions and subvert counterterrorism controls were especially egregious for a financial institution that knew the key role it played as a gatekeeper to the international financial system. The extent of assistance—comprising covert, illegal money laundering services and access to the international financial system over many years—was critical to the ability of terrorists in Iraq to obtain the weapons they used to commit their terrorist attacks, including the attacks on Plaintiffs. HypoVereinsbank was also present in Iran, providing indispensable and close support to IRISL throughout its period of assistance. HypoVereinsbank's

state of mind was highly culpable, consisting of prolonged, willful misconduct accompanied by systematic deception. Despite specific warnings from the U.S. government, HypoVereinsbank took deliberate steps to enable IRISL to evade detection, and provided extraordinary financial services to IRISL in an unusual, dangerous way. And the duration of its support lasted for years. Collectively, these factors easily make HypoVereinsbank's support for the attacks substantial.

199. The attacks that injured Plaintiffs were a foreseeable consequence of HypoVereinsbank's illegal acts. The many warnings about the role IRISL played in arming Iran's terrorist proxies in Iraq and HypoVereinsbank's continued services despite those warnings made it reasonably foreseeable that HypoVereinsbank was facilitating acts of terror. Indeed, a litany of authoritative sources established, at all relevant times, that facilitating transactions for IRISL would cause terrorist attacks. HypoVereinsbank was aware of these sources and could easily foresee that its illegal acts would result in the attacks in this case—but persisted anyway.

200. HypoVereinsbank's assistance was pervasive, systemic, and culpable, involving the highest levels of management, years of willful misconduct, and extraordinarily wrongful behavior in a near-common enterprise with IRISL that provided critically important operational assistance to Iran's systematic smuggling of weapons to terrorists, while obstructing U.S. counterterrorism controls, intelligence gathering, and investigations.

201. As a result of HypoVereinsbank's liability under 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages.

## JURY DEMAND

202. In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

203. Wherefore, Plaintiffs pray this Court:

a. Enter judgment against Defendant finding it liable under the Anti-Terrorism Act, 18 U.S.C. § 2333;

b. Award Plaintiffs compensatory and punitive damages to the maximum extent permitted by law, and treble any compensatory damages awarded under the Anti-Terrorism Act pursuant to 18 U.S.C. § 2333(a);

c. Award Plaintiffs their attorneys' fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

d. Award Plaintiffs prejudgment interest; and

e. Award Plaintiffs any such further relief the Court deems just and proper.

Dated: September 2, 2026

Respectfully submitted,

SPARACINO PLLC

*/s/ Jacob R. Loshin*

Ryan R. Sparacino (DC Bar No. 493700)
Jacob R. Loshin (DC Bar No. 989320)
Kathryn L. Rakoczy (DC Bar No. 994559)
SPARACINO PLLC
1920 L Street, NW, Suite 835
Washington, D.C. 20036
Tel: (202) 629-3530
ryan.sparacino@sparacinopllc.com
jacob.loshin@sparacinopllc.com
kate.rakoczy@sparacinopllc.com

*Counsel for Plaintiffs*